870 P.2d 1097

**STATE of Arizona, Appellee,**

v.

**Michael Steven GALLEGOS, Appellant.**

**No. CR–91–0149–AP.**

Supreme Court of Arizona,
En Banc.

March 15, 1994.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals Div., Jon G. Anderson, Asst. Atty. Gen., Phoenix, for the State.

John M. Antieau, Phoenix, for defendant-appellant.

## OPINION

CORCORAN, Justice.

Michael Steven Gallegos (defendant) was convicted of first degree murder and sexual conduct with a minor under the age of 15. The trial court sentenced him to death for murder and to a presumptive consecutive 20–year sentence for sexual conduct with a minor. This automatic appeal followed. *See* A.R.S. § 13–4031; rules 26.15, 31.2(b), and 31.15(a)(3), Arizona Rules of Criminal Procedure. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031, –4033. For the following reasons, we affirm defendant's convictions but remand this case for resentencing on the first degree murder conviction.

## ISSUES PRESENTED

The following issues are presented on appeal:

1. Was the evidence sufficient to support defendant's conviction for sexual conduct with a minor?

2. Did the trial court's instructions on sexual conduct with a minor, taken as a whole, mislead the jury?

3. Did the trial court err in instructing on the mental state of knowingly, intoxication, and ignorance?

4. Did the trial court err in precluding defendant's statements to a detention officer?

5. Did the admission of DNA evidence relating to the probabilities of a random DNA match constitute fundamental reversible error?

6. Was the aggravating factor of especially heinous, cruel, or depraved under A.R.S. § 13–703(F)(6) unconstitutionally vague as applied?

7. Was the aggravating factor of especially heinous, cruel, or depraved inapplicable because of lack of proof that defendant performed the bodily movements that killed the victim?

8. Did the trial court err in concluding that defendant murdered the victim in an especially heinous, cruel, or depraved manner?

9. Did the trial court err in using the victim's age to support two aggravating factors?

10. Did the trial court err in concluding that the mitigating factors failed to sufficiently outweigh the aggravating factors so as to call for leniency?

## FACTS AND PROCEDURAL HISTORY

The victim's mother (Mrs. W) met defendant's brother Jerry Gallegos (Gallegos) in Flagstaff in 1984. They moved to Phoenix in 1986 and eventually lived together in West Phoenix. By March 1990, the 8–year–old victim was the only child of Mrs. W who lived with the couple. In November 1989, the victim's half-brother, George, moved to Flagstaff to live with defendant and defendant's family. Defendant's parents became George's legal guardians. Defendant and George were friends and attended Coconino High School together.

George visited his mother (Mrs. W) and half-sister (the victim) in Phoenix during holidays, and defendant sometimes accompanied him. Defendant and George were on spring break in March 1990 and spent the week in the victim's home in Phoenix. They worked on their respective vehicles most of that week. In the afternoons, they were responsible for supervising the victim when she came home from school because both Mrs. W and Gallegos worked during the day.

Gallegos worked as an automotive repair foreman at a truck and trailer repair shop in Phoenix. On Thursday, March 15, 1990, at about 4:30 p.m., defendant and George went to Gallegos's repair shop to work on their vehicles. After the other employees left for the day, Gallegos supervised both defendant's and George's repair work. They drank some beer and worked on their vehicles until about 9:30 p.m. On their way home, Gallegos purchased a case of beer. They arrived home about 10:00 p.m. and continued working on the vehicles until about 10:30 p.m. During this time, Gallegos shared a couple of beers from his case with them. When defendant and George came into the house at about 10:30 p.m., the victim was bathing; she went to bed shortly thereafter. Mrs. W stopped by the victim's room to kiss her goodnight on her way to bed. Gallegos took a shower and then played a video game with defendant and George before he retired at about 11:30 p.m. On his way to bed, Gallegos checked the case of beer and found that the case was all "basically there."

As to the events that transpired later that night, defendant confessed on two occasions and testified at trial as follows. After Gallegos retired, defendant and George continued playing video games and drank more beer. Defendant suggested and George agreed that they go into the victim's room to fondle her. Once they were inside the victim's room, defendant lifted her nightgown and rubbed baby oil on the small of her back. When she began to awaken, George put his hand over her mouth, and defendant put his hand over

George's hand and over the victim's nose. The victim gasped for air and made sounds "like a little pig" but eventually went limp. Believing that the victim was dead, they decided to "finish her off." They pulled her body off the bed and placed her on the floor. George attempted to insert his penis into the victim's vagina. Defendant then had anal intercourse with her for 15 to 20 minutes. During this time, George stuck his penis inside the victim's mouth. After defendant completed the sex act, the two carried the victim's body out of the house and down the street where they dropped her naked body under a tree. They then returned to the house and went to bed.

Early the next morning, Mrs. W and Gallegos got up to go to work. The couple did not attempt to awaken the victim, because she did not have school that day. Mrs. W did, however, go into defendant and George's room to give them money to buy milk. George took the money and went to the store to purchase the milk. When he returned, defendant went outside to work on his vehicle. After talking with defendant, George called Mrs. W at work and told her that the victim was missing. Mrs. W left work and arrived back at the house at about 10:00 a.m. George also contacted both Gallegos and the police. When Gallegos and the police arrived, they began an extensive search of the neighborhood. Defendant and George participated in the search, but they deliberately avoided the area where they had dropped the victim's body. About 1:00 p.m., an unidentified boy alerted the police as to the body's location. The police found the victim's naked body under the tree where defendant claims that he and George left her the night before. Defendant's confessions and testimony in his own defense are the only evidence implicating George.

The detective in charge of controlling the crime scene testified that the body was located 252 feet from the victim's house. The naked victim was lying supine with her legs spread apart. The body was dirty and covered with grass. The officer noted obvious trauma to the vaginal area and some type of oil located on one leg and in the vaginal area. He further stated that he observed that the victim had sustained contusions to the left side of the face, the center forehead, the right eye, and the right side of the nose.

George Bolduc, M.D., the medical examiner who performed the autopsy, determined that the victim died of asphyxiation due to suffocation. He later testified at trial that the victim's rectum was "marketedly dilated" and that the anal trauma occurred while the victim was alive. He noted that the victim had various bruises and abrasions all over her face and body, some of which were red, indicating that they occurred while the victim was still alive. She also suffered a blunt force injury to her head, which caused a hemorrhage of the scalp. Mrs. W testified that, before the night of the murder, the victim had no noticeable bruises or marks.

The police searched the victim's house and seized numerous articles of evidence, including her underwear, nightshirt, and bed sheet. In the kitchen area, the police found an empty beer bottle and 2 empty cardboard beer cartons in a plastic trash container. They also found 2 empty beer cans across the room on the dishwasher and noted the presence of several hard liquor bottles on the kitchen shelves. In the carport, the police found another empty beer can and noticed a large cardboard box that was filled 3 to 4 feet high with empty aluminum beer and soda cans. After photographing the victim's room, the police dusted the room for fingerprints.

Because the house showed no signs of forced entry, the investigation focused on defendant and George. The police transported them to the police station for questioning. Officer Armando Saldate, Jr. and Detective Michael Chambers escorted them into separate interview rooms. Officer Saldate advised defendant of his *Miranda* rights and then questioned defendant while Detective Chambers simultaneously questioned George. After initially denying any involvement in the victim's death, defendant confessed to Officer Saldate. He later confessed a second time in the presence of both Officer Saldate and Detective Chambers. The trial court determined that these confessions were voluntary.

When George was confronted with defendant's confessions, he denied any involve-

ment in the victim's death. He stated that if defendant had implicated him, it was only because he did not want to take the blame alone. The two were subsequently indicted for the murder and sexual molestation of the victim.

The state submitted blood samples taken from defendant and George, along with the evidence obtained at the crime scene, to Cellmark Diagnostic Laboratories, Inc. (Cellmark) for deoxyribonucleic acid (DNA) testing. Cellmark later notified the state that George could not be included as a contributor to the evidence. The state then dismissed the case against George based on insufficient evidence.

During defendant's trial, the parties made the following stipulations regarding the tests of the physical evidence: (1) a fingerprint removed from the victim's bedroom matched defendant's right middle finger; (2) semen was detected on the victim's panties, nightshirt, and bed sheet; (3) DNA testing showed that the stain on the victim's panties contained a banding pattern that matched the banding pattern obtained from defendant's blood; and (4) the probability that an individual other than defendant was the source of the stain on the victim's panties was 1 in 10 million for Caucasians and 1 in 67 million for Hispanics. .

Defendant, an Hispanic, took the stand in his own defense and testified that he participated in the victim's death. He nevertheless maintained that he was drunk and that he did not intend to kill the victim. He also testified that he believed that the victim was dead at the time of the sexual penetration. On cross-examination, however, he was unable to explain the various bruises and abrasions on the victim's body. Defendant was prepared to call George as a witness, but on advice of George's counsel, George invoked his Fifth Amendment right not to testify.

The jury unanimously found defendant guilty of first degree murder and sexual conduct with a minor. The jury was divided, however, on whether the murder was premeditated or felony murder.

In the special verdict, the trial judge found two aggravating circumstances under A.R.S.

§ 13–703(F): (1) defendant committed the murder in an especially heinous, cruel, or depraved manner; and (2) defendant was an adult at the time of the offense and the victim was under 15 years of age. In mitigation, the judge found the defendant's age of 18 to be a statutory mitigating factor. He also found 2 non-statutory mitigating factors: (1) defendant's remorse, and (2) the recommendations of leniency from Officer Saldate and Detective Chambers. After considering and weighing each of the mitigating circumstances, the trial judge found that they were not sufficiently substantial to outweigh the aggravating factors and call for leniency. The judge noted that "[e]ach aggravating circumstance standing alone outweighs the total mitigation." Accordingly, the trial judge sentenced defendant to death for murder and to a presumptive consecutive 20–year term for sexual conduct with a minor.

## DISCUSSION

### I. TRIAL ISSUES

#### A. *Evidence of Sexual Conduct with a Minor*

Defendant claims that the evidence of sexual conduct with a minor was insufficient to sustain a conviction. The applicable statute provides:

A person commits sexual conduct with a minor by intentionally or *knowingly* engaging in sexual intercourse or oral sexual contact with any *person* who is under eighteen years of age.

A.R.S. § 13–1405(A) (emphasis added). Defendant argues that if the victim was dead at the time of the sexual penetration, his conduct would not be a crime within the meaning of the statute because § 13–1405 only criminalizes sexual conduct with a *person*. This argument implicitly relies on § 13–105(23), which defines a person as a "human being." Defendant maintains that a dead body is not a human being and therefore is not a person.

Defendant further argues that even if the victim was alive, he did not possess the culpable mental state of "knowingly" because he *believed* that the victim was dead at the time

of the sexual penetration. "Knowingly" means:

> [W]ith respect to conduct or to a circumstance described by a statute defining an offense, that a person is aware or believes that his or her conduct is of that nature or that the circumstance exists.

A.R.S. § 13–105(6)(b). Defendant contends that if a mistaken belief that the victim was over 18 is a defense to sexual conduct with a minor, A.R.S. § 13–1407(B), then a mistake as to victim's vitality likewise must constitute a defense.

■ In reviewing the sufficiency of the evidence, we examine the evidence in the light most favorable to sustaining the verdict, and we resolve all reasonable inferences against defendant. *State v. Atwood,* 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992). Dr. Bolduc, the medical examiner who performed the autopsy, testified that the anal trauma occurred while the victim was alive. This uncontradicted expert testimony defeats the argument that the victim was not a person at the time of the sexual penetration. *See State v. Lopez I,* 163 Ariz. 108, 112, 786 P.2d 959, 963 (1990) (toxicologist's testimony that tests revealed sexual penetration occurred before victim's death disposed of defendant's argument that sexual assault occurred after death).

■ We likewise reject defendant's contention that he did not possess the mental state of "knowingly" because he believed that the victim was dead at the time of the sexual penetration. Sufficient evidence establishes that defendant formed the intent to sexually assault the victim before her death. Officer Saldate's testimony regarding defendant's confessions, although not entirely consistent with defendant's trial testimony, included the following additional details. Officer Saldate testified that defendant had discussed with George his previous acts of sexual intercourse before entering the victim's room. Defendant further stated that he thought about fondling the victim's "ass." Defendant got the baby oil from the bathroom, which he

eventually applied to his penis and the victim's anus to facilitate the penetration. Defendant also stated that once he and George thought that the victim was dead, they decided that they "might as well finish."

In *State v. Comer,* we upheld the defendant's conviction for armed robbery of a dead victim in part because "the only reasonable inference based on the evidence was that [defendant] shot [the victim] in furtherance of his previously formulated plan to obtain money and supplies." 165 Ariz. 413, 421, 799 P.2d 333, 341 (1990). Here, the jury reasonably could have concluded that defendant murdered the victim "in furtherance of his previously formulated plan" to sexually assault her.

■ We also repudiate defendant's argument for public policy reasons. We refuse to apply a strict, literal interpretation to Arizona's Criminal Code as defendant would have us do. If the criminal code is to have any meaning, we must fairly construe its provisions to promote justice and give effect to the objects of the law. A.R.S. § 13–104 [1]; *see also State v. Tramble,* 144 Ariz. 48, 51, 695 P.2d 737, 740 (1985). This is not a case where defendant happened upon a dead body. Defendant beat and suffocated the victim in the course and furtherance of a sexual offense. We do nothing to promote justice by allowing a sex offender, who forcibly renders his victim unconscious before committing the sexual offense and ultimately kills her, to avoid conviction because he says that he mistakenly thought the victim was dead. Embracing such a concept would only encourage sex offenders to first kill their victims or render them unconscious before committing the sexual offense. *Cf. State v. Brobeck,* 751 S.W.2d 828, 832 (Tenn.1988) (requiring live victim as prerequisite to rape charge would encourage rapists to first kill victims).

Also, defendant contends that if a mistaken belief that the victim was over 18 years old is a defense to sexual conduct with a minor,

---

1. A.R.S. § 13–104 provides:
 *The general rule that a penal statute is to be strictly construed does not apply to this title,* but the provisions herein must be construed ac-

cording to the fair meaning of their terms to promote justice and effect the objects of the law. . . .
(Emphasis added.)

A.R.S. § 13–1407(B), then a mistake as to the victim's vitality likewise must constitute a defense. If the legislature had intended to establish such a defense, which we doubt for the reasons previously stated, then it could expressly have done so. *See generally* A.R.S. § 13–1407 (defenses).

B. *Jury Instructions on Sexual Conduct with a Minor*

The jury received the following *written* instructions on the charges of sexual conduct with a minor and attempted sexual conduct with a minor:

The crime of sexual conduct with a minor under age fifteen requires proof of the following two things:

1. The defendant knowingly penetrated the anus of another person with a part of his body; *and*

2. The other person had not reached her fifteenth birthday.

. . . .

The crime of Attempted [this word was not included in the verbal instructions] Sexual Conduct with a Minor requires proof of one of the following:

1. The defendant intentionally engaged in conduct which would have been a crime if the circumstances relating to the crime were as the defendant believed them to be; *or*

2. The defendant intentionally committed any act which was a step in a course of conduct which the defendant planned would end or believed would end in the commission of a crime; *or*

3. The defendant engaged in conduct intended to aid another person to commit a crime, in a manner which would make the defendant an *accomplice*, had the crime been committed or attempted [this word was included in the verbal instructions] by the other person.

(Third emphasis added.)

When the trial judge *verbally* instructed the jury on the charge of attempted sexual conduct with a minor, he omitted the word "attempted" from the title of the offense. Yet, his verbal instructions on the elements of the offense, including the 3 alternative bases upon which the jury could find defendant guilty, conformed precisely to the written instructions quoted above and included the word "attempted." The judge did not, however, define either the term "accomplice" or the theory of accomplice liability. *See* A.R.S. §§ 13–301 and –303(A)(3).

Defendant claims that the judge's verbal instructions may have confused the jury and caused it to return a guilty verdict on sexual conduct with a minor rather than attempted sexual conduct with a minor. That is, the jury could have mistakenly convicted defendant of sexual conduct with a minor under any one of the 3 definitions for *attempted* sexual conduct with a minor because the judge failed to differentiate between the two charges in his verbal instructions to the jury. Moreover, the jury could have convicted defendant of sexual conduct with a minor without understanding accomplice liability. And, it could have convicted him of felony murder based on his actions as an accomplice.

■ Jury instructions must be viewed in their entirety when determining whether they adequately reflect the law. *State v. Haas,* 138 Ariz. 413, 425, 675 P.2d 673, 685 (1983). If the instructions "are 'substantially free from error,' the defendant suffers no prejudice by their wording." *State v. Walton,* 159 Ariz. 571, 584, 769 P.2d 1017, 1030 (1989), quoting *State v. Norgard,* 103 Ariz. 381, 383, 442 P.2d 544, 546 (1968). "It is only when the instructions taken as a whole are such that it is reasonable to suppose the jury would be misled thereby that a case should be reversed for error therein." *State v. Schrock,* 149 Ariz. 433, 440, 719 P.2d 1049, 1056 (1986).

■ Defendant concedes that a copy of the *written* instructions was given to the jury, was available during its deliberations, was correct, and properly included the word "attempted." Furthermore, at the close of the verbal instructions, the judge instructed the jury that it alternatively could find defendant guilty of attempted sexual conduct with a minor. The jury was given separate verdict forms for the crimes of sexual conduct with a minor and attempted sexual conduct with a minor, and it returned a guilty verdict

on sexual conduct with a minor. It did not seek clarification of the instructions, and defendant did not present evidence of jury confusion. Mere speculation that the jury was confused is insufficient to establish actual jury confusion. *See Walton*, 159 Ariz. at 578, 769 P.2d at 1024. We therefore find that, taking the instructions as a whole, the jury was adequately instructed and defendant suffered no prejudice from the omission of the word "attempted" in the verbal instructions.

▮▮ Additionally, defendant failed to object to the judge's omission of the word "attempted" in the verbal instructions. He also did not object to the judge's failure to define "accomplice" or the theory of accomplice liability in the instructions. Failure to object at trial to an error or omission in the jury instructions waives the issue on appeal unless the error amounts to fundamental error. *State v. Valles*, 162 Ariz. 1, 6, 780 P.2d 1049, 1054 (1989). We have defined fundamental error as error that "reaches the foundation of the case or takes from the defendant a right essential to his defense, or is an error of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial." *State v. King*, 158 Ariz. 419, 424, 763 P.2d 239, 244 (1988). Also, we have stated that the prejudice stemming from an unobjected-to error must be analyzed in light of the entire record. *State v. Thomas*, 130 Ariz. 432, 436, 636 P.2d 1214, 1218 (1981); *see also State v. Gendron*, 168 Ariz. 153, 155, 812 P.2d 626, 628 (1991). "If there is substantial evidence in the record to support the verdict and it can be said that the error did not, beyond a reasonable doubt, contribute significantly to the verdict, reversal is not required." *Thomas*, 130 Ariz. at 436, 636 P.2d at 1218.

▮▮ Overwhelming evidence in the record supports the jury's verdict. The instructions on sexual conduct with a minor provided that "defendant knowingly penetrated the anus of another person with a part of his body; and [t]he other person had not reached her fifteenth birthday." Defendant confessed on two occasions and testified at trial that he sexually penetrated the victim's anus. The stained material on the victim's panties contained a DNA banding pattern

that matched the banding pattern of defendant's blood. Defendant's fingerprint was lifted from the victim's room. In addition, no evidence was presented that George or anyone else penetrated the victim's anus. Defendant's only defense was that the victim was dead. As defendant admits, Dr. Bolduc's uncontradicted testimony indicated that anal trauma occurred while the victim was alive. We therefore find beyond a reasonable doubt that the error had no effect on the jury's verdict.

### C. *Intoxication Instructions*

The trial judge instructed the jury as follows:

> "Knowingly" means that a defendant acted with awareness of, or belief in, the existence of conduct or circumstances constituting an offense.
>
> . . . .
>
> *It is no defense* that the defendant was not aware of or could not believe in the existence of conduct or circumstances solely because of *voluntary intoxication.*

(Emphasis added.)

▮▮ Defendant argues that the latter portion of this instruction regarding voluntary intoxication misstates the law. Initially, he notes that this instruction would be correct if the relevant mental state in this case were "recklessly" because A.R.S. § 13–105(6)(c), which defines "recklessly," expressly provides that voluntary intoxication will not negate a "reckless" culpable mental state. Defendant then points out that § 13–105(6)(b), which defines "knowingly," is silent as to voluntary intoxication and how it bears upon a "knowing" culpable mental state. From this, he concludes that the legislature has not expressly precluded voluntary intoxication from negating the culpable mental state of "knowingly," and therefore, the above instruction constitutes reversible error. We disagree.

In 1980, the legislature directly addressed this issue when it amended § 13–503 to provide that a jury may consider voluntary intoxication *only* when determining whether a defendant acted with the culpable mental

state of "intentionally or with the intent to." [2] And, previous decisions by this court illustrate that the law in Arizona is clear: "the jury may *not* consider voluntary intoxication with respect to the defendant's culpable mental state [of knowingly]." *State v. Schurz,* 176 Ariz. 46, 55, 859 P.2d 156, 165 (1993) (emphasis added); *accord State v. Rankovich,* 159 Ariz. 116, 122, 765 P.2d 518, 524 (1988); *State v. Ramos,* 133 Ariz. 4, 6, 648 P.2d 119, 121 (1982).

Defendant attempts to distinguish the above cases on grounds that they involved only the issue of whether a defendant charged with "knowingly" committing an offense is *entitled to* a voluntary intoxication instruction under § 13–503. Defendant concedes that because he was charged with "knowingly" instead of "intentionally" engaging in sexual conduct with a minor, he was not entitled to a voluntary intoxication instruction. Rather, in two separate but related arguments, defendant apparently claims that the trial judge should not have given any instruction as to the effect of voluntary intoxication on culpability.

■ Defendant first contends that, given his alleged belief that the victim was dead at the time of the sexual penetration, the trial judge erred by not instructing the jury that ignorance or mistake of fact is a defense if it negates the culpable mental state required for the commission of an offense. *See* A.R.S. § 13–204.[3] Alternatively, defendant argues that even if he was not entitled to an instruction under § 13–204 because he failed to request one, the instruction that the trial judge *in fact gave* was directly contrary to § 13–204 because that section does not expressly state that a mistake of fact resulting from voluntary intoxication cannot negate the culpable mental state of "knowingly."

We find both of defendant's arguments without merit. In effect, defendant's arguments are an attempt to bootstrap a voluntary intoxication defense onto a mistake of fact defense. As discussed above, a voluntary intoxication defense is not available to a defendant charged with an offense for which the culpable mental state is "knowingly." The trial judge's instructions regarding the effect of voluntary intoxication on culpability were taken directly from *Recommended Arizona Jury Instructions,* Criminal 1.056(b) and 5.03, and we find these instructions to be consistent with Arizona law. Therefore, the trial judge committed no error when instructing the jury as to the effect of defendant's alleged voluntary intoxication on his culpability.

■ Defendant's claim that the trial judge should have instructed the jury on ignorance or mistake of fact is likewise flawed. Defendant failed to request this instruction in the trial court, and therefore this issue has been waived. *See* rule 21.3(c), Arizona Rules of Criminal Procedure. Moreover, a trial judge's failure to give an instruction *sua sponte* provides grounds for reversal only if such failure is fundamental error. *State v. Lucas,* 146 Ariz. 597, 603–04, 708 P.2d 81, 87–88 (1985). The trial judge's failure to give an ignorance or mistake of fact instruction certainly was not fundamental error because, as we stated previously, defendant's alleged mistake as to the victim's vitality provides no defense in this case to the charge of sexual conduct with a minor.

### D. *Defendant's Statements to a Detention Officer*

■ While being booked into the Maricopa County Jail, defendant told a detention officer, "It looks like I'm going to be in jail

---

**2.** Section 13–503 provides as follows:

§ 13–503. **Effect of intoxication; consideration by jury**

No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition, but when the actual existence of the culpable mental state of *intentionally or with the intent to* is a necessary element to constitute any particular species or degree of offense, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the culpable mental state with which he committed the act.

Laws 1980, Ch. 229, § 6 (emphasis added).

**3.** A.R.S. § 13–204 provides:

A. Ignorance or a mistaken belief as to a matter of fact does not relieve a person of criminal liability unless:

1. It negates the culpable mental state required for commission of the offense; ....

for a very long time." He further stated: "I did it. I drank a lot of bourbon and beer. I didn't mean for it to happen."

At a pretrial hearing, the state argued that the above statement was inadmissible hearsay. In response, defendant claimed that the statement was admissible as a prior consistent statement. At that time, the trial judge postponed his ruling and asked the parties to submit authority to assist the court in rendering its decision. The following day, during the hearing on the motion in limine, defendant raised two new grounds for the statement's admissibility: (1) it was against defendant's penal interest, and (2) it was admissible under the state of mind exception. *See* rules 804(b)(3) and 803(3), Arizona Rules of Evidence. Without discussing the merits of defendant's additional arguments, the trial judge determined only whether the statement was a prior consistent statement. He then ruled that the prior consistent statement "exception" did not apply because "the statement was not made prior to the defendant having a motive to fabricate."

On appeal, defendant argues that the trial judge erred in so ruling because defendant's statement was admissible as a present sense impression and as a statement of his then-existing mental or emotional condition. *See* rules 803(1) and (3). We need not address defendant's claims of admissibility because any possible error is harmless.

Defendant testified at trial that he may have consumed as many as 18 to 21 beers, that he shared a half-gallon of scotch with George and another friend, and that he drank some tequila. He further testified that he was drunk and that he did not intend to kill the victim. Officer Saldate's testimony at trial confirmed that defendant had confessed both that he did not intend to kill the victim and that he had consumed similar amounts of alcohol. As such, defendant's statement to the detention officer was merely cumulative to his confessions and trial testimony. We therefore find that, even assuming error occurred, any error in excluding this evidence was harmless beyond a reasonable doubt. *See State v. Jeffers*, 135 Ariz. 404, 423, 661 P.2d 1105, 1124 (1983) (not reversible error when witness's statement of-

fered by defendant improperly excluded by trial judge as hearsay because merely cumulative to other proffered testimony by witness).

### E. *Admission of DNA Evidence*

The state submitted defendant's blood and other seized evidence to Cellmark for DNA testing. The parties stipulated that the test results indicated that the stained material on the victim's panties contained a DNA banding pattern that matched defendant's banding pattern. The parties further stipulated that, according to Cellmark's calculations, the statistical probability of a random match would be 1 in 10 million in Caucasians and 1 in 67 million in Hispanics.

In *State v. Bible*, 175 Ariz. 549, 858 P.2d 1152 (1993), we recently held that the techniques and standards that Cellmark uses to declare a DNA "match" are generally accepted in the relevant scientific community and comply with *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). Yet, we also concluded that the scientific community does not generally accept the procedures that Cellmark uses to calculate the statistical probability of a random match, and therefore such evidence is inadmissible. Defendant did not object at trial to the admission of the evidence relating to the statistical probabilities of a random match, and in fact he stipulated to this evidence. Moreover, he did not raise this issue on appeal. We therefore must independently review the record to determine whether the admission of this evidence constituted fundamental error.

Identity was not at issue in this case. Defendant confessed on two occasions and testified at trial that he participated in the killing and that he had anal intercourse with the victim. His defense was that he was drunk and that he did not intend to kill the victim. Also, defendant claimed that he believed the victim was dead at the time of the sexual penetration. Admitting the DNA evidence relating to the statistical probabilities of a random match, therefore, did not go to the foundation of defendant's case, take away a right essential to his defense, or deprive him of a fair trial. Thus, we find that admis-

sion of this evidence did not constitute fundamental error.

## II. SENTENCING ISSUES

### A. *Vagueness of A.R.S. § 13–703(F)(6) as Applied*

██ Defendant first contends that the aggravating factor of "especially heinous, cruel, or depraved" is unconstitutionally vague as applied to him "[b]ecause of the pattern of arbitrariness in finding this factor, without adherence to statutory requirements."

The United States Supreme Court has upheld the constitutionality of this statutory provision, and has found that we have construed its operative terms "in a manner that furnishes sufficient guidance to the sentencer." *Walton v. Arizona*, 497 U.S. 639, 655, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511 (1990). The trial judge specifically applied our limited construction of the terms especially "heinous," "cruel," and "depraved" in its special verdict. We therefore find no support in the record for defendant's contention that the judge applied this factor without adhering to statutory requirements. *See State v. Runningeagle*, 176 Ariz. 59, 64, 859 P.2d 169, 174 (1993).

██ Defendant next contends that the (F)(6) aggravating factor is inapplicable, absent proof that he performed the bodily movements that caused the victim's death. He therefore claims that this factor is unconstitutionally vague as applied to him. We find defendant's contention without merit.

We previously have found this aggravating factor applicable to a defendant who was present at a homicide and who actively participated in the events leading up to the killing, even though he did not actively participate in the actual killing. *State v. Tison*, 129 Ariz. 526, 544, 633 P.2d 335, 353 (1981). According to defendant's own confessions and trial testimony, he actively participated in the killing. Defendant testified that after George placed his hand over the victim's mouth, defendant then placed his hand over George's hand and the victim's nose, thereby fatally cutting off her air supply. When defendant was pointedly asked on cross-examination whether he actively participated in killing the victim, he responded that he did.

In making its findings pursuant to *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the trial judge found "beyond any doubt that defendant killed [the victim]...." The judge's special verdict also stated that George "has had his charges dismissed, has not been convicted of anything, and is presumed by law to be innocent." The record does not support defendant's contention that the trial judge in some way considered George's "involvement" in the killing. We find that defendant was held accountable only for his own actions.

### B. *A.R.S. § 13–703(F)(6), Especially Heinous, Cruel, or Depraved*

██ Defendant argues that the trial judge erred in finding that the murder was committed in an especially heinous, cruel, or depraved manner. These factors are considered in the disjunctive; therefore, the presence of any one factor is sufficient to establish the aggravating circumstance under the statute. *State v. Fulminante*, 161 Ariz. 237, 254, 778 P.2d 602, 619 (1988).

██ Heinousness and depravity focus on defendant's mental state and attitude at the time of the offense as evidenced by his words and actions. *State v. Salazar*, 173 Ariz. 399, 412, 844 P.2d 566, 579 (1992). In determining whether the murder was committed in a heinous or depraved manner, we consider 5 factors: (1) whether defendant relished the murder, (2) whether defendant inflicted gratuitous violence on the victim, (3) whether defendant mutilated the victim, (4) the senselessness of the crime, and (5) the helplessness of the victim. *State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983). "The mere existence of senselessness or helplessness of the victim, in isolation, need not always lead to a holding that the crime is heinous or depraved...." *Gretzler*, 135 Ariz. at 52–53, 659 P.2d at 11–12. "Either or both of these factors [senselessness and helplessness], considered together with other circumstances present in a particular case, may lead to the conclusion that an offense was heinous or depraved." *Gretzler*, 135 Ariz. at

52, 659 P.2d at 11. Here, we have more. *See Runningeagle*, 176 Ariz. at 65, 859 P.2d at 175.

■ We believe that the record in this case supports a finding of senselessness, helplessness, and gratuitous violence. The victim was helpless; she was an 8–year–old girl who stood a mere 4 feet 5 inches tall and weighed only 57 pounds. Defendant, an 18–year–old male who was in a trust relationship with the victim, stole into the victim's room while she was asleep and senselessly suffocated her. We agree with the trial judge that the victim "never had a chance."

We further find that defendant inflicted gratuitous violence on the victim. Recently, we held that a defendant's act of necrophilia "without question" constituted the infliction of gratuitous violence on the victim. *State v. Brewer*, 170 Ariz. 486, 502, 826 P.2d 783, 799 (1992). Here, the trial court noted that the medical examiner testified that the "injuries to [the victim's] rectum were inflicted either premortem or contemporaneously with her death [perimortem]." Defendant, however, testified that he had anal intercourse with the victim for about 15 to 20 minutes after she went limp and *after* he believed she was dead. Thus, defendant believed he was committing an act of necrophilia. Defendant explained his conduct in a statement made during the presentence investigation:

> He stated that he went ahead and finished the act because "it wasn't like she was going to tell anybody." He sodomize[d] the victim because it was like "why not." He knew he was going to get caught the next day.

This statement evinces the depravity of defendant's mental state. Moreover, other evidence of gratuitous violence exists. After defendant sodomized the victim, he dumped her naked body under a tree where it was found, bruised and battered, the next day.

We think the record supports the trial judge's finding that the murder was committed in an especially heinous or depraved manner. We therefore need not address the judge's finding of cruelty.

C. *Use of the Victim's Age in Aggravation*

■ Defendant concedes that the aggravating circumstance defined at § 13–703(F)(9) applies to him because he was tried as an adult and the murder victim was under 15 years of age. Defendant nevertheless maintains that he was "double punished" when the trial court also considered the victim's age in finding that the murder was committed in an especially heinous or depraved manner. Specifically, defendant argues that the trial judge's finding of "helplessness" was "nothing more than a repetition of the fact that the victim was an eight year old child and facts derivative from that one." We disagree.

■ A court may consider the same evidence to support the finding of more than one aggravating factor as long as it is only weighed once in determining whether to impose the death penalty. *See State v. Marlow*, 163 Ariz. 65, 72, 786 P.2d 395, 402 (1989) (evidence that defendant killed to avoid detection used to support aggravating factors of murder for pecuniary gain and murder committed in heinous, cruel, or depraved manner); *State v. Tittle*, 147 Ariz. 339, 345, 710 P.2d 449, 455 (1985) (defendant's prior conviction used to support aggravating factors of prior conviction involving use or threat of violence and prior conviction for which under Arizona law sentence of life imprisonment or death was imposable). In the special verdict, the trial judge stated: "[w]hile the fact of [the victim's] age of eight is being used to determine the existence of two aggravating factors, the Court will consider her age only once in the weighing process." We find defendant's contention of double punishment without merit and find that the trial judge properly applied the law. *See also State v. Jimenez*, 165 Ariz. 444, 455, 799 P.2d 785, 796 (1990) (victim's age considered in finding both (F)(6) and (F)(9) aggravating factors).

■ Furthermore, we find no credence in defendant's contention that the judge's finding of helplessness was merely a repetition of the fact that the victim was 8 years old. The defendant was, in a loose sense, the victim's "uncle" and had access to her bedroom based

solely on this trust relationship. Defendant entered the victim's room and suffocated her while she was helplessly lying asleep. Thus, the facts in this case support a finding of helplessness without regard to the victim's age.

### D. *Mitigating Circumstances*

When sentencing a defendant convicted of first degree murder, the sentencing judge must consider any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether the death penalty is appropriate. *State v. McCall,* 139 Ariz. 147, 162, 677 P.2d 920, 935 (1983). Although the judge must consider all evidence proffered by defendant in mitigation, the judge has discretion when determining how much weight to give to each proffered mitigating factor. *State v. Fierro,* 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990). Defendant must prove by a preponderance of the evidence the existence of any mitigating factor. *Fierro,* 166 Ariz. at 551, 804 P.2d at 84.

The trial judge sentenced defendant to death, finding that the total mitigating circumstances were insufficient to warrant leniency. Defendant claims that the trial judge either disregarded or gave inadequate weight to the following mitigating factors: (1) defendant's age, (2) defendant's impairment, (3) defendant's remorse, (4) defendant's lack of intent, (5) the dismissal of charges against George, and (6) the recommendations of leniency from Officer Saldate and Detective Chambers. On appeal, we must independently review the record to determine the absence or existence of both aggravating and mitigating circumstances. *State v. Gillies I,* 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983). We address each of the alleged mitigating circumstances separately.

### 1. *Defendant's Age*

We agree with the trial judge that defendant's age of 18 and his relative immaturity at the time of the murder constitute a statutory mitigating circumstance under A.R.S. § 13–703(G)(5). We therefore go on to consider the other alleged mitigating circumstances.

### 2. *Defendant's Impairment*

#### a. *A.R.S. § 13–703(G)(1)*

Under § 13–703(G)(1), impairment may constitute a mitigating factor if, at the time of the offense, "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was *significantly* impaired...." (emphasis added); *see also Fierro,* 166 Ariz. at 553–54, 804 P.2d at 86–87. In this case, however, we agree with the trial judge that defendant's impairment on the night of the murder did not rise to the level of "significant" impairment.

Defendant testified that he smoked marijuana and may have consumed as many as 18 to 21 beers on the day of the murder. He additionally testified that he drank some tequila and that he, George, and another friend shared a half-gallon of scotch.

Yet, defendant's prodigious alcohol consumption is largely uncorroborated. Gallegos testified that he gave defendant 2 or 3 beers when they were at the garage and then an additional 2 or 3 beers when they returned home later that evening. The last 2 or 3 beers he gave defendant came from a case that he had purchased on his way home from work. Gallegos checked this case before he went to bed and noticed that the beers were all "basically there." He also checked the case the following day and did not notice anything unusual from his check the previous evening.

A search of the house revealed only 4 empty beer containers and 2 empty beer cartons. Defendant nevertheless maintained that he threw his empty containers into a large cardboard box, which was located in the carport and was filled with empty aluminum cans. A scotch bottle also was found almost empty, but defendant and George may have consumed this liquor earlier in the week.

Notwithstanding the lack of physical evidence to corroborate defendant's testimony, other evidence in the record indicates that defendant was not significantly impaired on the night of the murder. Despite his claim

that he had consumed a substantial amount of alcohol, defendant's own testimony revealed that he was able to work on his vehicle at least sporadically from 4:30 until 10:30 p.m. He then played video games with George and Gallegos. Gallegos, who also was drinking, testified that defendant was doing much better than he was at the video games. He also testified that he did not notice anything unusual about defendant's behavior or speech, and that it seemed like just another normal evening. Mrs. W, who was not drinking, testified that she did not observe defendant drinking any beer that evening. She also testified that defendant did not appear to be drunk. When she was asked why she earlier had told an investigator that defendant appeared drunk, she responded:

> At the time he just—he looked giddy, happy. It was—I don't know how to term it. Just happy. Giddy. He was not stammering. He was not incoherent. He was totally concentrating and doing well on the [video] game.

Defendant's testimony and his confession to Officer Saldate revealed his state of mind immediately following the murder. Defendant told Officer Saldate that after he carried the victim's body out of the house, he locked the door behind him. Officer Saldate asked him why he did this, and Saldate described defendant's response as follows:

> [I]f [Gallegos] would have got up, ... he would have probably immediately gone to the bedroom where they sleep and questioned them about the fact why the door is unlocked, when he specifically told them to lock it before they went to sleep.

Defendant also testified that before he and George carried the body outside, he told George to take off his shoes so that he would not make any noise walking down the street.

Defendant's statements and his attempt to conceal the murder show that he appreciated the wrongfulness of his conduct and that he acted with significant foresight. John P. DiBacco, Ph.D., who conducted the diagnostic evaluation of defendant pursuant to rule 26.5, Arizona Rules of Criminal Procedure, found that:

> [A]lthough he may have been significantly intoxicated when he committed the crime his intent was clear to molest the child and then cover-up his resulting crimes.... [A]lthough [defendant] may have been intoxicated at the time of the crime, ... he did ... *appreciate the wrongfulness of his act.*

(Emphasis added.)

Despite evidence in the record indicating that defendant was impaired to some degree on the night of the murder, this impairment alone is insufficient to constitute a mitigating factor under § 13–703(G)(1). *See State v. Woratzeck,* 134 Ariz. 452, 458, 657 P.2d 865, 871 (1982). We agree with the trial judge that defendant's intoxication did not significantly impair his ability to conform his conduct to the requirements of the law or his ability to appreciate the wrongfulness of his conduct. The trial judge therefore was correct in finding this statutory mitigating factor inapplicable.

### b. *Non–Statutory Mitigation*

Proof of defendant's impairment was not limited to evidence that he was intoxicated on the night of the murder. Defendant also presented evidence that he had a history of alcohol and drug abuse, as well as a documented learning disability. As discussed above, we agree with the trial judge's determination that defendant was not significantly impaired on the night of the murder, and therefore, his impairment does not constitute a mitigating factor under § 13–703(G)(1). A trial court's inquiry, however, must not end there. *State v. McMurtrey,* 136 Ariz. 93, 102, 664 P.2d 637, 646 (1983).

Although defendant's impairment on the night of the murder did not rise to the level of a *statutory* mitigating circumstance, the trial judge should have considered whether such impairment, when viewed in light of defendant's alleged history of alcohol and drug abuse, constituted a *non-statutory* mitigating circumstance. *See Fierro,* 166 Ariz. at 553–54, 804 P.2d at 86–87. Yet, nothing in the special verdict indicates that the trial judge made this determination. We therefore must examine the record to determine

whether defendant's impairment constitutes a non-statutory mitigating circumstance.

██ Initially, we note that defendant considers himself an alcoholic. He testified at trial that he has been consuming large amounts of alcohol predominately on weekends since he was 12–13 years old. In addition, he testified that the week of the murder, he consumed alcohol on a daily basis. Yet, defendant's claim of serious alcohol dependency is largely uncorroborated. In 1988, a juvenile court placed defendant on probation for felony theft. As a result, defendant's probation officer required that defendant come to his office once a week as part of his regular probation checks. At defendant's aggravation/mitigation hearing, the probation officer testified that through his weekly contacts with defendant, he did not detect any serious problem with alcohol use. However, when Dr. DiBacco conducted his psychological evaluation of defendant just before the sentencing hearing, he noted: "It is further important to indicate that [defendant] did obtain a significant elevation on the McAndrew scale, which indicates prominent drug and/or alcohol ideation, if not abuse and dependency."

Furthermore, defendant has a documented history of drug use. In 1984, a juvenile court placed him on probation for possession of marijuana. While on probation in 1989 for felony theft, defendant tested positive for marijuana and methamphetamine. The presentence report, however, revealed that he had stopped using crystal methamphetamine about a year before the commission of the present crime. The record therefore indicates that marijuana was the only drug defendant had been using just prior to the night of the murder.

Finally, defendant is learning disabled and has attended special education classes since approximately the fourth grade. This factor, however, does not appear to have contributed significantly to his level of impairment. Indeed, after diagnostic evaluation, Dr. DiBacco determined that defendant "is not mentally deficient" and noted that test results indicated that he has "at least average fluid intelligence."

Overall, after considering the evidence that defendant was impaired to some degree on the night of the murder, as well as his history of drug and alcohol abuse, we find that defendant's impairment constitutes a non-statutory mitigating circumstance in this case. The trial judge, however, failed to consider defendant's impairment in mitigation when determining whether to sentence him to death.

The dissent maintains that the trial judge undoubtedly considered all of the impairment evidence before imposing defendant's sentence. On the contrary, we think the special verdict indicates that once the trial judge determined that defendant's impairment did not meet the (G)(1) standard, he concluded that impairment was not a mitigating circumstance in this case.

After discussing the evidence that defendant had presented regarding his impairment, the trial judge stated:

On balance the evidence suggests that the voluntary consumption of alcohol by the defendant immediately prior to the murder impaired his ability to conform his conduct to the requirements of law. On the other hand, there was no appreciable impairment to his capacity to appreciate the wrongfulness of his conduct. The test is disjunctive. Neither impairment rises to the level of *significantly impaired*. Therefore this mitigating circumstance does not exist.

This finding appeared in a section of the special verdict labelled "MITIGATION—STATUTORY." Yet, nowhere in the section labelled "MITIGATION—NONSTATUTORY" did the trial judge mention defendant's impairment. In fact, the judge listed the non-statutory mitigating circumstances that he thought defendant had proved by a preponderance of the evidence, and impairment was not included on this list. It is this fact, along with the trial judge's statement that he "considered and weighed each of the mitigating circumstances offered by defendant *and proved to exist by a preponderance of the evidence*," that leads us to the conclusion that the trial judge disregarded defendant's impairment when determining whether to sentence him to death. Because we cannot ascertain whether the trial judge would have

sentenced defendant to death had he considered defendant's impairment as a non-statutory mitigating circumstance, we remand this case for resentencing. *See McMurtrey*, 136 Ariz. at 101–02, 664 P.2d at 645–46 (remanding for resentencing after trial judge failed to consider potentially mitigating evidence that did not meet standard specified in § 13–703(G)(1)).

### 3. *Remorse*

▮▮▮▮ Remorse may constitute a non-statutory mitigating circumstance. *State v. Brewer*, 170 Ariz. 486, 507, 826 P.2d 783, 804 (1992). In this case, the trial judge determined that "defendant [was] remorseful for his actions in killing and debasing [the victim]" and found that this remorse constituted a mitigating circumstance.

Defendant claims that he did not intend to kill the victim. Nevertheless, once he believed that he had caused her death, his actions demonstrated little remorse. After the victim lost consciousness, defendant proceeded to have anal intercourse with her for 15 to 20 minutes. Moreover, after he finished sodomizing her, he carried her naked body out of the house and dumped her under a tree. He then returned to the house and went to bed. When he awakened the next morning, he began working on his vehicle as if nothing had happened. When he spoke with Gallegos about the fact that the victim was missing, defendant lied about her fate. And, when the police arrived, he did not tell them what had happened or where the victim's body was located. Instead, he participated in a feigned search for her, deliberately avoiding the area where he had dumped her naked body the night before.

After the police found the victim's body, they took defendant to the police station for questioning, and he initially denied any involvement in the victim's death. It was only when Officer Saldate stated that he believed defendant was involved in the murder that defendant eventually confessed. Even after his confessions, defendant deflected his personal responsibility for the victim's death by blaming his actions on alcohol and by implicating George, whose involvement in the

murder, if any, has not been shown except by defendant's statements.

We find that defendant's initial actions evinced little remorse. But, we agree with the trial judge that defendant's cooperation with the police in the investigation of the murder, after his initial denial, and his verbal expression of remorse at sentencing, justify the finding that "defendant was remorseful for his actions."

### 4. *Lack of Intent*

▮▮▮ Defendant testified that he did not intend to kill the victim and that he intended only to molest her. More specifically, defendant claims that when he was attempting to silence the victim, he accidentally suffocated her. This testimony is belied by the fact that the victim was found with bruises and abrasions located all over her face and body, some of which were pre-mortem. She also suffered a blunt force injury to her head, which caused a hemorrhage of the scalp. Defendant was unable to explain these injuries. Additionally, the jury was divided over whether the murder was premeditated or felony murder.

In evaluating whether lack of intent constitutes a mitigating factor, we previously have stated:

> Traditionally, the term "intent" has encompassed more than a desire or purpose to achieve a specific result. Generally, when a defendant acts with the knowledge that his behavior is substantially likely to cause a result he is considered to intend that result.

*State v. Jordan*, 126 Ariz. 283, 288, 614 P.2d 825, 830 (1980). Defendant testified that after he forcibly blocked the victim's air passages, she struggled and gasped for air. At his sentencing hearing, defendant further acknowledged that the victim was fighting for her life when this "accident" occurred.

Even if we were to accept defendant's claim that he *did not desire* to kill the victim, the fact remains that he still acted with knowledge that his behavior was substantially likely to cause this result.[4] We therefore

---

4. We also note that in its special verdict, the trial

court found that defendant's "mental state was,

agree with the trial judge that this mitigating circumstance is inapplicable.

### 5. *Dismissal of Charges Against George*

▮▮▮ Defendant claims that the trial judge erred by not considering the dismissal of charges against George as a mitigating circumstance. We find defendant's claim without merit. This court occasionally will consider as a mitigating circumstance the disparity between the sentences of a defendant sentenced to death for a murder and that of an accomplice or codefendant who received a lesser sentence. *State v. Schurz*, 176 Ariz. 46, 57, 859 P.2d 156, 167 (1993). This consideration, however, has no application when insufficient evidence exists to charge the other party with the alleged crime. George did not enter into a plea agreement or plead guilty to a lesser offense. He did not testify against defendant. He has at all times denied involvement in the crimes. Aside from defendant's confessions and testimony at trial, the only thing that could be construed as implicating George is a statement by Detective Chambers found in defendant's presentence report, which states:

> When Detective Chambers questioned [George] about committing the murder, George ... told him, "I could have done this, but I don't remember it, I black out a lot."

The defense called George as a witness at trial, and he invoked his Fifth Amendment privilege against self-incrimination. George is presumed innocent until he is proven guilty, and his fate cannot be compared to that of a convicted murderer. Furthermore, if evidence is uncovered at some future time that links George to this crime, he can again be charged for this murder because the charges against him were dismissed without prejudice.

### 6. *Recommendations of Leniency*

▮▮▮ Officer Saldate and Detective Chambers recommended that defendant receive a life sentence rather than the death penalty. The trial judge found that these recommendations were a mitigating circumstance. We acknowledge that a recommendation of leniency from authorities who are intimately involved in a case carries significant weight and may constitute a mitigating circumstance.

Officer Saldate testified on defendant's behalf at the sentencing hearing. During cross-examination, the following exchange took place between the prosecutor and Officer Saldate:

> BY MR. [LOUIS] STALZER [the prosecutor]:
>
> Q Sir, if we could raise a hypothetical and have [George] seated next to [defendant], that they're both found guilty for the crimes, would your opinion as to sentence be any different?
>
> A [DET. SALDATE] Yes.
>
> Q In what way?
>
> A *I believe they each should get the death penalty.* I believe that they would—it's my opinion to give someone a death penalty for a situation, I feel that he should be totally responsible for that situation, to get the death penalty. I think [defendant] is partially responsible for this act.
>
> Q So you're saying part of the reprieve is the fact that [George] is not in this court or some other court facing the same charges?
>
> A That is correct.
>
> (Emphasis added.)

Detective Chambers also testified at the presentence hearing and was interviewed during the presentence investigation. The presentence investigation report noted that his recommendation for leniency was based on defendant's immaturity, his intoxication, and his remorse. It was also clear, however, that his recommendation was motivated in part by the dismissal of charges against George. The report reads:

> Phoenix Police Detective Mike Chambers has very strong feelings in regard to this case. He knows that defendant is guilty of murder and sexual assault. How-

---

*at the very least,* one of reckless indifference to the value of human life, pursuant to the requirements of *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987)." (Emphasis added.)

ever, he asks the Court to waive the death penalty because the defendant worked in concert with [George]. Detective Chambers believes that [George] should be standing there with the defendant at the time of sentencing.

. . . .

Detective Chambers saw remorse on the part of the defendant when he was interviewed, but saw no remorse from [George] because, Detective Chambers believes, he was only concerned for himself. In the interest of justice, Detective Chambers would like to see both George and the defendant get twenty years instead of the defendant getting the death penalty.

We have already determined that the dismissal of charges against George is not a legally relevant mitigating factor. The record indicates that Detective Chambers's recommendation is based at least partially on his perception that George has received favorable treatment. Officer Saldate's testimony reveals that he believes *both* defendant *and* George should receive the death penalty. On the whole, however, we agree with the trial judge that the recommendations of leniency by the investigating police officers are a non-statutory mitigating factor.

## III. INDEPENDENT REVIEW

 Other than defendant's impairment, which we addressed above, our independent review of the record discloses no additional mitigating factors. We agree with the trial judge that the state has proved the existence of both the (F)(6) and the (F)(9) aggravating factors beyond a reasonable doubt. Also, we have reviewed and considered all of the mitigation evidence presented.

To summarize, we agree with the trial judge that defendant's age and relative immaturity at the time of the murder is a statutory mitigating factor. In addition, we agree that the police officers' recommendations of leniency constitute a non-statutory mitigating circumstance and defendant's remorse is a non-statutory mitigating circumstance. Our review of the special verdict, however, reveals that the trial judge did not consider defendant's impairment as a non-statutory mitigating circumstance. Yet, we

find that defendant's impairment on the night of the murder, when coupled with his history of drug and alcohol abuse, constitutes a non-statutory mitigating circumstance in this case. Having found this additional mitigating circumstance, we must determine whether we should reweigh the aggravating and mitigating circumstances, or rather, remand this case to the trial court for resentencing.

Until recently, this court had not established a uniform approach for dealing with those cases in which we set aside an aggravating circumstance or recognize an additional mitigating circumstance. In *State v. Bible,* however, we said:

> In any capital case where additional evidence is to be received, remand is required. . . . Some cases will not require the submission of additional evidence but only the reweighing and balancing of the evidence. Many of these cases will involve situations in which the trial judge erred with respect to aggravating or mitigating circumstances and in which *there is mitigating evidence of some weight.* In these cases, too, remand for resentencing is the better rule.

175 Ariz. 549, 608, 858 P.2d 1152, 1211 (1993) (emphasis added).

In this case, clearly "there is mitigating evidence of some weight" that the trial judge failed to consider. This is not a case in which the mitigating evidence acknowledged by this court is *de minimis.* It therefore does not fit squarely within the narrow exception enunciated in *Bible. See Bible,* 175 Ariz. at 609, 858 P.2d at 1212; *cf. State v. Milke,* 177 Ariz. 118, 128, 865 P.2d 779, 789 (1993) (mitigating evidence *de minimis* ); *State v. Styers,* 177 Ariz. 104, 117, 865 P.2d 765, 778 (1993) (same); *State v. Scott,* 177 Ariz. 131, 145, 865 P.2d 792, 806 (1993) (additional mitigating circumstance of "minimal significance"). Nor is this a case in which we are able to conclude, based solely upon our independent review of the record, that leniency is required. As such, it is distinguishable from *State v. Stuard,* 176 Ariz. 589, 609, 863 P.2d 881, 901 (1993), in which we reduced the defendant's sentences from death to life

imprisonment upon determining that the trial judge failed to give evidence of defendant's impairment the mitigating weight it deserved.

■ Our review of the record in *Stuard* indicated that the trial judge had considered defendant's impairment in mitigation, even though he did not include an express statement to that effect in his special verdict. It was that fact, along with our independent determination that the mitigating circumstances substantially outweighed the aggravating circumstances, that made a remand for resentencing unnecessary. When this court independently concludes that a death sentence is clearly inappropriate, deference to the trial judge's contrary determination is not required.

The circumstances of this case, however, are different from those in *Stuard.* As we explained above, our examination of the special verdict indicates that the trial judge did not consider defendant's impairment. For that reason, we believe that the trial judge, who has heard the evidence and seen the witnesses, is in the best position to reweigh and balance the aggravating and mitigating circumstances to determine whether they are sufficiently substantial to call for leniency in this case. *See Bible,* 175 Ariz. at 609, 858 P.2d at 1212. Accordingly, we remand the case to the trial court for resentencing.

## CONSIDERATION OF MITIGATING CIRCUMSTANCES

In recent years, this court has encountered a number of capital cases in which a trial court either incorrectly evaluated or failed to recognize important mitigating evidence. *See Bible,* 175 Ariz. at 606–07, 858 P.2d at 1209–10 (citations omitted). More specifically, we often find that a trial judge, upon determining that evidence offered in mitigation does not rise to the level of a statutory mitigating factor under A.R.S. § 13–703(G), fails to address whether such evidence nonetheless constitutes a non-statutory mitigating circumstance. *See, e.g., Fierro,* 166 Ariz. at 553–54, 804 P.2d at 86–87; *McMurtrey,* 136 Ariz. at 102, 664 P.2d at 646. We therefore are unable to discern whether the trial judge considered all evidence offered in mitigation

before sentencing a defendant to death. *See State v. Leslie,* 147 Ariz. 38, 50, 708 P.2d 719, 731 (1985); *McMurtrey,* 136 Ariz. at 102, 664 P.2d at 646. As a result, and in accordance with our recent decision in *Bible,* we find it necessary to remand the case to the trial court for resentencing. 175 Ariz. at 609, 858 P.2d at 1212. Because this case requires us to once again remand a capital case for resentencing, we take this opportunity to provide some guidance to trial courts in an attempt to prevent such remands from becoming a recurring scenario in future cases.

■ Our prior case law provides a clear directive to trial judges faced with evaluating evidence offered in mitigation by a defendant sentenced to death. Even if such evidence does not meet the relevant statutory standard set forth in § 13–703(G), we have maintained that,

[i]n order to remain faithful to *Lockett* and *Watson,* ... the court's inquiry may not end there. The court must consider the offered evidence further to determine whether it in some other way suggests that the defendant should be treated with leniency.

*McMurtrey,* 136 Ariz. at 102, 664 P.2d at 646. In short, the trial judge must determine whether the offered evidence constitutes a *non-statutory* mitigating circumstance.

Although we realize that a trial court is not writing for the ages, both this court and the federal courts will review the special verdict for a decade or a generation. Consequently, the special verdict must be thorough, and it must acknowledge and consider *all* mitigating circumstances. *See, e.g., Leslie,* 147 Ariz. at 50, 708 P.2d at 731; *McMurtrey,* 136 Ariz. at 102, 664 P.2d at 646. Moreover, it should consider each mitigating circumstance *individually* and all mitigating circumstances *cumulatively.*

■ We attempted in *Leslie* to provide more precise guidance on how a trial judge might comply in practice with the above directive. 147 Ariz. at 49–50, 708 P.2d at 730–31. We suggested that, although not strictly required, "the better practice is for the trial court to place, on the record, a list of all

factors offered by a defendant in mitigation and then explain [the judge's] reasons for accepting or rejecting them." *Leslie,* 147 Ariz. at 50, 708 P.2d at 731.[5] This advice remains valid today, and moreover, it applies equally to both statutory and non-statutory mitigating circumstances.

▇ Finally, we emphasize that trial courts should not hesitate to find that evidence offered by a defendant (or presented in the record) in mitigation constitutes a non-statutory mitigating circumstance. In fact, we urge trial courts to treat all arguably mitigating evidence as a non-statutory mitigating circumstance entitled to at least some weight. Of course, because a trial court has discretion in determining how much weight to give each mitigating circumstance, non-statutory mitigating circumstances might not be entitled to much weight either individually or cumulatively.

▇ Our advice today does not imply, as the dissent suggests, that a case necessarily will be remanded whenever a trial judge fails to list all conceivable mitigating circumstances in the special verdict. Nor does it imply that a generic recitation in the special verdict proclaiming that the trial judge considered all possible mitigating circumstances, whether statutory or non-statutory, will satisfy this court.[6] Instead, the underlying message is that, on review, this court must be satisfied that the trial judge did in fact consider all mitigating circumstances when determining whether to sentence a defendant to death. In each capital case, if a trial court properly acknowledges and includes in the balancing process all plausible mitigating circumstances, then it may be able to avoid revisiting the case after a remand for resentencing.

## DISPOSITION

We have examined the record for fundamental error pursuant to A.R.S. § 13–4035 and have found none. We affirm both judg-

ments of conviction, and we affirm defendant's sentence for sexual conduct with a minor under the age of 15. Because we find defendant's impairment to be an additional mitigating circumstance not considered by the trial court, we remand for resentencing on the first degree murder conviction.

FELDMAN, C.J., MOELLER, V.C.J., and ZLAKET, J., concur.

MARTONE, Justice, dissenting in part.

I do not agree that we must remand for resentencing. The trial judge "considered and weighed each of the mitigating circumstances offered by the defendant." Special verdict at 10. This included all of the impairment evidence. The defendant *argued* it as a statutory mitigating circumstance, and did not argue it as a non-statutory mitigating circumstance below or on appeal. While a judge must consider all relevant mitigating evidence offered by the defendant, he did so here. The judge need not refer to arguments the defendant does not make. In *State v. Lopez,* 175 Ariz. 407, 857 P.2d 1261 (1993), we specifically said:

> The burden of proving mitigation is on the defendant, A.R.S. § 13–703(C), and the duty to call such evidence to the court's attention also is on the defendant.

*Id.* at 415–16, 857 P.2d at 1269–70. We also said that "the defendant did not argue in the trial court what he argues here, i.e., that the trial court should expressly consider the intoxication evidence as mitigation even if it fell short of statutory mitigation." *Id.* at 416, 857 P.2d at 1270.

*State v. Watson,* 120 Ariz. 441, 445, 586 P.2d 1253, 1257 (1978), is not to the contrary. It just holds that a defendant has a right to present non-statutory mitigating evidence. It does not hold that in addition to considering such evidence, the court must also consider it again in a category not argued by the defendant. *State v. McMurtrey,* 136 Ariz. 93, 102, 664 P.2d 637, 646 (1983) contains

---

**5.** A starting point in cataloging and analyzing mitigating circumstances should be the information provided by the defendant to the prosecutor pursuant to rule 15.2(g), Arizona Rules of Criminal Procedure.

**6.** Indeed, the language suggested by the dissent, although obviously intended as rhetorical hyperbole, illustrates the type of generic recitation that this court likely would find unsatisfactory.

dicta which can be read to support the court's decision here today. But I read *McMurtrey* more narrowly. I see it as a case suggesting remand where a trial judge in fact does not consider the mitigating evidence offered. But here, the trial judge specifically said that he considered and weighed "each of the mitigating circumstances offered by the defendant." Special verdict at 10. In addition, the trial judge said "each aggravating circumstance standing alone outweighs the total mitigation." Special verdict at 11.

It is, thus, a triumph of form over substance to remand this case to the trial judge to consider already considered evidence under the rubric of a non-statutory argument. The result should not change. We serve no purpose but to extend the delay that has become the hallmark of capital sentencing nationwide. *Dobbs v. Zant,* — U.S. —, —, 113 S.Ct. 835, 836, 122 L.Ed.2d 103 (1993) (Scalia, J., concurring). We also add to that "impenetrable complexity and hence a propensity to error" that infect the capital sentencing process. *Richmond v. Lewis,* — U.S. —, —, 113 S.Ct. 528, 538, 121 L.Ed.2d 411 (1992) (Scalia, J., dissenting).

I do not believe that today's decision, or the court's advice, will in any way promote the trustworthiness of capital sentencing. Instead, in order to avoid being blind-sided, trial judges will understandably add to every special verdict language of this sort:

> I have considered all of the evidence the defendant has offered in mitigation, whether statutory or non-statutory, whether argued or not, and whether known to me at the time of the special verdict or not.

This adds nothing to the quality of the process. I respectfully dissent.