258 P.3d 263

**STATE of Arizona, Appellee,**

v.

**Frank Lerma GAMEZ, Appellant.**

**No. 1 CA–CR 10–0482.**

Court of Appeals of Arizona, Division 1, Department E.

July 5, 2011.

Thomas C. Horne, Arizona Attorney General By Kent E. Cattani, Chief Counsel, Criminal Appeals/Capital Litigation Section And Robert A. Walsh, Assistant Attorney General, Phoenix, Attorneys for Appellee.

James J. Haas, Maricopa County Public Defender By Margaret M. Green, Deputy Public Defender, Phoenix, Attorneys for Appellant.

**OPINION**

SWANN, Judge.

¶ 1 Frank Lerma Gamez appeals from his convictions for sexual conduct with a minor, unlawful imprisonment, resisting arrest, and aggravated assault. He contends that the trial court committed reversible error when it precluded him from arguing, as an affirmative defense, that he believed the victim of the sexual conduct charges was 18 years old. For reasons set forth more fully below, we affirm.

*FACTS* [1] *AND PROCEDURAL HISTORY*

¶ 2 In May 2007, Yolanda sent her 13-year-old daughter Betty to live with family in New Mexico because Betty was not attending school and was periodically running away from their home in Texas.

¶ 3 While living with her maternal uncle and his wife in Carlsbad, New Mexico, Betty was unhappy because her uncle was "real strict." She asked to return to her mother in Texas, but her uncle and aunt refused and

1. We view the evidence in the light most favorable to sustaining the jury's convictions and resolve all reasonable inferences against defendant.

*State v. Manzanedo,* 210 Ariz. 292, 293, ¶ 3, 110 P.3d 1026, 1027 (App.2005).

her mother did not have the financial resources to send for her.

¶ 4 Betty began using chat rooms on the Internet. Those chat rooms limited entry to people over 18 years old, so Betty lied and said that her name was "Emily" and that she was 18 years old. She met Gamez in one of these chat rooms; he told her that he was 21 and she told him she was 18. After they exchanged pictures, Gamez remarked, "you don't really look 18," to which Betty responded that she was really 16.

¶ 5 Betty told Gamez about her situation with her uncle and that she wanted to return to her mother in Texas. Gamez informed her that he was headed for Phoenix and that he would be happy to take her and then send her home from there. It was close to Christmas, and the "plan" was that she would stay with Gamez in Phoenix for "a couple of months or so" before she went back to Texas. They arranged to meet at her church, one of the few places her uncle and aunt allowed her to go on her own.

¶ 6 On December 5, 2007, Gamez sent his female cousin to the church to pick up Betty. The cousin drove Betty to a convenience store in Carlsbad where, for the first time, she met Gamez in person.[2]

¶ 7 Before meeting in person, Betty and Gamez had been "just friends," but that night, when they got to Roswell, New Mexico, they "decided to be girlfriend and boyfriend." During their stay in Roswell, they played a drinking game and Gamez attempted to have intercourse with Betty, but stopped when she told him she "didn't want to because it was hurting [her]."

¶ 8 Gamez drove Betty to Phoenix, where they rented a house. Throughout January and February 2008, Gamez and Betty "would keep trying and trying" to have sex, and Gamez would stop every time she told him it was hurting her until, finally, on one occasion, "he pushed [his penis] in all the way." By Gamez's own account, they were then having sexual intercourse "more or less"

three to four times monthly during this time period, including one time on Valentine's Day 2008, two months before Betty's 14th birthday.

¶ 9 The couple never used any contraception, and, sometime between February 1 and March 1, Betty realized that she had skipped her period for a couple of months. Gamez "started getting worried," so he purchased a home pregnancy test in March 2008 and confirmed that Betty was pregnant. Betty was 13.

¶ 10 Gamez and Betty next moved to an apartment in Mesa that they shared with a married couple. Betty told them that she was 18 because Gamez told Betty that "he was 21 and [she] was 16" and he would get in trouble if they found out she was not 18. However, Betty believed that Gamez had "kind of figured" that she was not 16 after he asked her for the password on her telephone, which was her birth date, and he stated "but your password says '94." She did not know how to respond to him, and the two of them "never talked about it again." Thereafter, Gamez "just kept saying, just tell everybody you're 18."

¶ 11 While they were in Mesa, Gamez started drinking more heavily and his behavior with Betty deteriorated. He threatened that if she "ever rat[ted] [him] out" he would hurt her or the baby. Gamez continued to respond to Betty's ongoing requests to go home by saying that he would send her home "soon," but he never did. Betty had no identification and no money with which to leave on her own. She never received any prenatal care while living with Gamez because she was a "runaway" and they both knew that she would "get caught" if she went to a hospital.

¶ 12 On August 15, 2008, Gamez and Betty were at dinner at the home of Gamez's brother in Mesa when Mesa Police officers arrived and asked for "a pregnant girl." Betty initially attempted to conceal her identity and

2. After learning of her daughter's disappearance in December 2007, Yolanda traveled to Carlsbad and contacted the Carlsbad Police Department and the Missing Child Program. They helped her get notice of Betty's disappearance aired on

local news channels. Yolanda also distributed Betty's photograph in various public locations. Nothing came of her efforts and Yolanda returned to Texas a month later.

told the officers that she was "Emily" and that she was 16. However, she admitted who she was after the officers stated "don't lie to us because we know who you are already." The officers then took her to Child Protective Services. According to Betty, she and Gamez had had sexual intercourse for the last time "like a week or a couple of days" before the police found her.

¶ 13 While the officers were dealing with Betty, Gamez left through a window in the back of the house and returned to the apartment. Gamez found a paper containing the phone numbers of Betty's relatives, and proceeded to call her mother. According to Gamez, it was only in his telephone conversation with Yolanda that he learned that "Emily" had lied to him and was really "Betty" and that Betty was not 18. Gamez then purchased a bus ticket to go to Roswell, after which he was purportedly going to fly to Austin to meet with Betty's mother.

¶ 14 On August 19, 2008, Mesa Police Detective Brandi George interviewed Betty.[3] Betty told George several different stories that the detective did not believe. It was only after George told Betty that she could get in trouble for hindering the investigation that Betty finally revealed Gamez's identity and agreed to participate in a confrontation call with him.

¶ 15 During the confrontation call Betty tried to get Gamez to meet her at a specific location, but he lied and said that he was in Texas. Gamez informed Betty that he had called Yolanda and told her that he was 17. He also acknowledged that the baby was theirs and that he would help take care of it. At one point in the conversation Gamez asked Betty, "You are 16, right?" When Betty replied, "I know that you know how old I really am," Gamez responded, "Yes, I do."

¶ 16 Upon learning Gamez's identity and address, members of the Mesa Police fugitive unit started searching for him. They learned

he was staying at a particular residence, and a couple who lived there indicated that Gamez was inside and consented to the officers' entry. Police entered the home, repeatedly announcing in both Spanish and English who they were and that Gamez should surrender. Gamez was ultimately located hiding under hanging clothes inside a walk-in closet. Despite repeated commands that Gamez "show . . . his hands" and come out, Gamez refused to comply. Even after being Tased several times, Gamez continued to fight police officers as they attempted to take him into custody, grabbing one officer's groin and also head-butting and kicking him.

¶ 17 DNA evidence obtained while Gamez was in custody established that Gamez was the father of Betty's child.

¶ 18 The state charged Gamez with: Counts 1–3, sexual conduct with a minor under the age of 15, each a class 2 felony and dangerous crime against children; Count 4, unlawful imprisonment, a class 4 felony; Count 5, resisting arrest, a class 6 felony; and Count 6, aggravated assault of a peace officer, a class 6 felony.

¶ 19 Before trial, the state filed a motion in limine "to preclude Gamez from arguing that [because] he thought the minor victim was 18 years old, and/or that he was unaware of her actual age," he should be found not guilty.[4] In response, Gamez asserted that the state was required to prove that he intentionally and knowingly had sexual intercourse with Betty and also that he knew Betty was under the age of 15 at the time. The trial court granted the state's motion.

¶ 20 Also before trial, Gamez asked the fiancée of a fellow-inmate to pose as his attorney, contact Betty's uncle and offer him and the family money if Betty did not appear to testify at trial. And during trial, Gamez called Betty's uncle and offered him and Betty money if she did not return to the stand to complete her trial testimony.[5] Both

---

3. According to Betty, it was during this interview that she learned for the first time that Gamez was actually 37 years old.

4. In fact, Gamez did argue at trial that he thought Betty was 18.

5. Gamez used the jail's taped telephone line to make the call. In a separate case not before us on appeal, the state brought additional charges against Gamez. He ultimately pled guilty to conspiracy to commit influencing a victim, a class 5 felony, with one prior felony conviction for resisting arrest, which consisted of Count 5 in

the fiancee and the uncle testified at trial and the tapes of their conversations were played for the jury.

¶ 21 The jury found Gamez guilty of each charged offense, except Count 3—sexual conduct between August 1 and August 19, 2008. The jury also found that Gamez committed the sexual conduct offenses in Counts 1 and 2 when the victim was "13 or 14 years of age" and, with regard to the unlawful imprisonment offense, that Gamez voluntarily released the victim without physical injury in a safe place before his arrest.

¶ 22 The trial court sentenced Gamez to a mitigated, flat-time sentence of 16 years in prison on each of the sexual conduct offenses (Counts 1 and 2); a presumptive sentence of 6 months in prison for unlawful imprisonment (Count 4); a presumptive sentence of 1 year in prison for resisting arrest (Count 5); and a presumptive sentence of 1 year in prison for aggravated assault (Count 6). It ordered that the sentences on Counts 1 and 2 be served consecutively, and the remaining counts be served concurrently.

¶ 23 Gamez timely appeals. We have jurisdiction pursuant to A.R.S. §§ 12–120.21(A)(1), 13–4031 and –4033.

### DISCUSSION

¶ 24 Gamez maintains that the trial court erred when it precluded him from arguing that the state did not meet its burden of proving every element of the offense of sexual conduct with a minor because it purportedly did not prove that he "knew" that Betty was under 15 years of age. We find the trial court committed no error.

¶ 25 We review a trial court's ruling on a motion in limine for an abuse of discretion—the same standard we apply to rulings on motions to suppress. *State v. Super. Ct. (Druke)*, 128 Ariz. 583, 585, 627 P.2d 1081, 1083 (1981). "The decision whether to admit or exclude evidence is left to the sound discretion of the trial court." *State v. Murray*, 162 Ariz. 211, 214, 782 P.2d 329, 332 (App. 1989); *see also State v. Amaya–Ruiz*, 166 Ariz. 152, 167, 800 P.2d 1260, 1275 (1990) (allowing the trial court considerable discretion in determining relevancy and admissibility of evidence).

¶ 26 We review issues involving statutory interpretation de novo. *State v. Christian*, 205 Ariz. 64, 66, ¶ 6, 66 P.3d 1241, 1243 (2003). Our task in construing a statute is to fulfill the intent of the legislature that wrote it. *State v. Korzep*, 165 Ariz. 490, 493, 799 P.2d 831, 834 (1990). We look first to the language of the statute because it is "the best and most reliable index of a statute's meaning." *State v. Williams*, 175 Ariz. 98, 100, 854 P.2d 131, 133 (1993) (citation omitted). "If the language is plain, we need look no further." *Id. See also State v. Hansen*, 215 Ariz. 287, 289, ¶ 7, 160 P.3d 166, 168 (2007) (finding the best and most reliable index of a statute's meaning is its language; if the language is clear and unequivocal, it is determinative of construction).

¶ 27 Statutes that are *in pari materia*—those that relate to the same subject matter or have the same general purpose as one another—should be construed together as though they constitute one law. *State v. Barraza*, 209 Ariz. 441, 444, ¶ 10, 104 P.3d 172, 175 (App.2005). This rule applies even where the statutes in question have been enacted at different times, because we assume that the legislature was aware of the statutes existing at the time it acted. *See State ex rel. Larson v. Farley*, 106 Ariz. 119, 122, 471 P.2d 731, 734 (1970) (in absence of express repeal or amendment, later enacted statute held to have been enacted in accord with legislative policies in earlier statutes); *State v. Slayton*, 214 Ariz. 511, 516, ¶ 19, 154 P.3d 1057, 1062 (App.2007) (presumption that the legislature knows existing laws when it enacts or modifies statute).

¶ 28 Under A.R.S. § 13–1405(A), "[a] person commits sexual conduct with a minor by intentionally or knowingly engaging in sexual intercourse ... with any person who is under eighteen years of age." Gamez maintains that the "knowingly and intentionally" *mens rea* component of the statute applies to the fact that the person was under the age of 18 as well as to the sexual act.

the present case. Gamez was sentenced to the presumptive term of 2.25 years in prison.

According to Gamez's interpretation of this language, the state was required to prove both that (1) he "knowingly and intentionally" had sexual intercourse with the victim and that (2) he "knew" she was under 18. We disagree.

¶ 29 The plain language of the statute simply requires that the state prove (1) that a defendant "knowingly and intentionally" engaged in sexual conduct with the victim and (2) that the victim was "under the age of eighteen" at the time. There is nothing in the plain language of the statute that requires proof that the perpetrator engaged in the sexual act while also knowing that the person was under 18.

¶ 30 When the legislature intends that the *mens rea* apply to the status of the victim, it says so explicitly. For example, to establish the elements of aggravated assault versus simple assault on a police officer, the legislature has provided that the state must prove that the defendant knowingly caused the requisite injury while "knowing or having reason to know that the victim is . . . a peace officer . . . engaged in the execution of any official duties." A.R.S. §§ 13–1203(A), – 1204(A)(8)(a). Had the legislature intended to require the state in this context to prove that a defendant knew the victim was under 18, it would have said so in A.R.S. § 13–1405(A).[6]

¶ 31 Other cases have implicitly found that the "knowing and intentional" *mens rea* applies only to the sexual act, including *State v. Gallegos*, 178 Ariz. 1, 870 P.2d 1097 (1994), and *State v. Denning*, 155 Ariz. 459, 747 P.2d 620 (App.1987), the two cases relied upon by the trial court in reaching its decision. In *Gallegos*, the defendant argued that the victim was "a dead body" at the time of sexual penetration and therefore not "a person" for purposes of § 13–405(A). 178 Ariz. at 8, 870 P.2d at 1104. He also argued that, even if

the evidence established that the victim was alive at the time of penetration, he did not possess the culpable mental state because he "believed that the victim was dead at the time." *Id.* at 9–10, 870 P.2d at 1104–05. Our supreme court rejected these arguments on the ground that sexual conduct occurred before death, but also noted that had the legislature intended to establish such a mistaken belief as a defense, it would have expressly done so when it enacted A.R.S. § 13–1407.[7] *Id.* at 9–10, 870 P.2d at 1105–06.

¶ 32 In *Denning*, this court reviewed an earlier version of the statute, A.R.S. § 13–1406(A), which provided that a person committed sexual assault with a minor by "intentionally or knowingly engaging in sexual intercourse . . . with any person without consent." 155 Ariz. at 461, 747 P.2d at 622. Section (B) of the statute provided that if the victim is "under fifteen years of age" the sexual assault would be a class 2 felony "punishable pursuant to A.R.S. § 13–604.01," *id.*, which attached a presumptive term of 20 years in prison as a "dangerous crime against children." *Id.* at 461 n. 1, 747 P.2d at 622 n. 1.

¶ 33 The defendant in *Denning* initially contended on appeal that the state failed to establish his knowledge of the victim's age at the time of the offense. *Id.* at 461, 747 P.2d at 622. We held there that the language of § 13–1406(A) did not include knowledge of the victim's age as an element of the crime— it required only (1) that a defendant intentionally or knowingly engaged in sexual intercourse with "any person," and (2) that it was without the victim's consent. *Id.* We further found that subsection (B) of the statute did not engraft on A.R.S. § 13–1406(A) "the additional element that a defendant know the victim is under fifteen years of age," but simply allowed for the enhance-

---

6. In this case, the state charged defendant with having sexual intercourse with Betty, "who was a minor under the age of fifteen years." The state was therefore required to establish at trial that Betty was "under the age of fifteen" when defendant had sexual intercourse with her. The fact that it did so is reflected in the special verdicts, in which the jury specifically found that Betty "was 13 or 14 years of age" at the time.

7. A.R.S. § 13–1407(B) provides: "It is a defense to a prosecution pursuant to sections 13–1404 and 13–1405 in which the victim's lack of consent is based on incapacity to consent because the victim was fifteen, sixteen or seventeen years of age if at the time the defendant engaged in the conduct constituting the offense the defendant did not know and could not reasonably have known the age of the victim."

ment of the sentence when the victim was under 15. *Id.* We find the reasoning of *Gallegos* and *Denning* instructive.

¶ 34 Moreover, nothing in the language of the "Defenses" statute, A.R.S. § 13–1407(B), engrafts knowledge of the victim's age as an element of guilt under § 13–1405. Section 13–1407(B) provides in relevant part that it is a defense to a prosecution pursuant to § 13–1405 "in which the victim's lack of consent is based on incapacity to consent because the victim was fifteen, sixteen or seventeen years of age if at the time the defendant engaged in the conduct constituting the offense the defendant did not know and could not reasonably have known the age of the victim."

¶ 35 Gamez argues that, although A.R.S. § 13–1407(B) is "persuasive in its exclusion of the defense for victims under the age of 15, when read together with other statutes, it becomes 'less convincing.'" We fail to see how the legislature expressed an intent to require proof of knowledge of the victim's age when it excluded *lack* of knowledge of the age of a thirteen-year-old victim as a defense. Gamez looks to the language of A.R.S. § 13–103, which states that an affirmative defense cannot include "any defense that ... denies an element of the offense charged." Gamez reasons that because A.R.S. § 13–1407(B) permits an affirmative defense when the victim is 15, 16, or 17 years of age, if a defendant shows that he "did not know and could not reasonably have known the age of the victim," then the age of the victim must be an element of the offense. We find Gamez's logic flawed: indeed, if denial of knowledge of some victims' ages can be an affirmative defense, then knowledge of the victim's age *cannot* be an element.

 ¶ 36 Gamez's argument is further undermined by the fact that we must construe A.R.S. §§ 13–1405 and –1407 as being *in pari materia* and constituting one law. *Ex rel. Larson,* 106 Ariz. at 122, 471 P.2d at 734. Were we to adopt Gamez's reasoning, it would render the language of § 13–1407(B) superfluous because a defendant would be entitled to present the affirmative defense that he "did not know" the age of his victim no matter what the age of that victim, regardless of whether the victim was "fifteen,

sixteen or seventeen" as § 13–1407(B) dictates. We reject such an interpretation as "contrary to the cardinal rule of statutory construction that statutes should be interpreted so that no clause, sentence, or word is rendered superfluous or void." *U.S. West Commc'ns, Inc. v. Ariz. Dep't of Revenue,* 193 Ariz. 319, 323, ¶ 16, 972 P.2d 652, 656 (App.1998).

 ¶ 37 Due process requires only that the state prove every *element* of a crime beyond a reasonable doubt. *State v. Farley,* 199 Ariz. 542, 545, ¶ 13, 19 P.3d 1258, 1261 (App.2001). The state did so here by proving that Gamez knowingly and intentionally engaged in sexual intercourse with Betty when she was under the age of 15. A.R.S. § 13–1405(A), (B). In this case, where the victim was 13 years old at the time of the offenses, the trial court did not err in determining that Gamez was precluded from claiming an affirmative defense under the statute's provisions. We conclude that A.R.S. § 13–1405 is not unconstitutional on its face or as applied in this case.

## CONCLUSION

¶ 38 We hold that under A.R.S. § 13–1405 the state must prove the victim's age at the time of the offense as an element of the crime, but it is not required by the statute to prove defendant's knowledge of the victim's age. We therefore affirm Gamez's convictions and sentences.

CONCURRING: PATRICK IRVINE and MAURICE PORTLEY, Judges