IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee,*

*v.*

CHARLIE CONLEY JR.,
*Appellant.*

No. 2 CA-CR 2021-0111
Filed January 20, 2023

---

Appeal from the Superior Court in Pima County
No. CR20182849001
The Honorable Teresa Godoy, Judge Pro Tempore
The Honorable Renee Bennett, Judge

**AFFIRMED**

---

COUNSEL

Kris Mayes, Arizona Attorney General
Alice Jones, Acting Deputy Solicitor General/Chief of Criminal Appeals
By Tanja K. Kelly, Assistant Attorney General, Tucson
*Counsel for Appellee*

Robert A. Kerry, Tucson
*Counsel for Appellant*

**OPINION**

Presiding Judge Eckerstrom authored the opinion of the Court, in which Chief Judge Vásquez concurred and Judge Cattani concurred in part and dissented in part.

E C K E R S T R O M, Presiding Judge:

**¶1**　　　Charlie Conley Jr. appeals from his convictions and sentences for kidnapping, sexual assault, sexual assault of a minor, and sexual conduct with a minor. He challenges the trial court's refusal to sever the charges regarding the four separate victims in question, as well as multiple aspects of the prosecutor's conduct. For the reasons that follow, we affirm.

**Factual and Procedural Background**

**¶2**　　　We view the evidence in the light most favorable to sustaining the jury's verdicts, resolving all reasonable inferences against Conley. *State v. Gamez*, 227 Ariz. 445, n.1 (App. 2011). In 1992, when J.G. was fifteen years old and weighed "probably about 95 pounds," Conley drove her against her will to an abandoned shack, where he dragged her inside and raped her. In 1995, when K.C. was crossing a street, Conley and an accomplice pulled her into a car, drove her to a house, and dragged her inside, where Conley raped her. She was eighteen or nineteen years old at the time and weighed "maybe 98, 100 pounds." Both victims submitted to hospital sexual assault examinations and reported their rapes to law enforcement. However, police suspended both cases shortly afterward.

**¶3**　　　In 1999, when twenty-two-year-old C.B. was walking to a convenience store, Conley dragged her into an alley, forced her into an unfurnished apartment, and raped her. C.B.—who weighed "a hundred pounds, if that" at the time—submitted to a sexual assault examination at the hospital and reported the incident to law enforcement. A week or two later, she identified Conley in a photo lineup. Police obtained a buccal swab from Conley, who admitted to having had sex with C.B. but claimed it had been consensual. However, C.B.'s sexual assault examination had revealed injuries consistent with rape. Nonetheless, the state declined to issue a complaint.

¶4         In 2004, when fourteen-year-old W.L. was alone in the laundry room of an apartment complex, Conley grabbed her from behind, dragged her into an abandoned unit, and raped her as another man watched. W.L. reported the incident to police and identified Conley, whom she knew, as her rapist. Police encountered Conley in the apartment complex, which was known to contain abandoned units consistent with W.L.'s report. Conley provided his identifying information and confirmed he knew W.L. Nevertheless, police did not investigate him and closed W.L.'s case shortly afterward.

¶5         In all four cases, the victims heard nothing more from law enforcement until 2018. By that point, cold-case testing had identified Conley as the likely contributor of the male DNA found on the swabs collected during J.G.'s and K.C.'s sexual assault examinations.[1] His name appeared in law enforcement databases because C.B. and W.L. had identified him as their assailant in similar rapes. Police reinitiated contact with all four victims and questioned Conley.

¶6         In July 2018, a grand jury indicted Conley for various crimes related to the four incidents. His first trial, on counts related to all four victims, ended in a mistrial. After a second trial, again on counts related to all four victims, Conley's motion for a new trial was granted. During a third trial, once again on counts related to all four victims, in September 2021, all four victims testified. The state also presented the testimony of medical professionals involved in the sexual assault examinations, scientists involved in the DNA testing, and law enforcement officers involved in investigating the cases.

¶7         At the conclusion of a four-day trial, a jury found Conley guilty of kidnapping and sexually assaulting J.G. and K.C., sexually assaulting C.B., and, as to W.L., both sexual assault of and sexual conduct with a minor under fifteen. After establishing that Conley had three previous felony convictions, the trial court sentenced him to consecutive prison terms totaling 111 years. This appeal followed. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

---

[1]The rape kit collected in C.B.'s case had apparently been destroyed by 2018, such that no DNA comparison was possible when the cases were revisited.

**Motion to Sever**

¶8      Conley repeatedly sought to sever the counts pertaining to each individual victim. The trial court refused to do so, finding that the charges had been properly joined under a theory of "common scheme or plan" pursuant to Rule 13.3(a)(3), Ariz. R. Crim. P. In particular, the court found that the four incidents had involved an "overarching plan" involving "a serial offender who preys on or selects very young, vulnerable, tiny women who are in areas that are isolated. They're by themselves. They're taken to abandoned places, whether . . . apartments or homes, where they are sexually assaulted."

¶9      On appeal, Conley contends the trial court erred in denying his motion to sever. He claims the state was improperly permitted to carry out a "strategy" whereby its "weaker cases" were tried alongside its "stronger cases so the jury would find [him] guilty because the cases seemed facially similar." He argues that the court should have interpreted Rule 13.3(a)(3) narrowly and granted severance to ensure that he would receive "a fair trial without the prejudice of having evidence of one crime stand as evidence of another crime." We review a trial court's denial of a motion to sever for an abuse of discretion. *State v. Burns*, 237 Ariz. 1, ¶ 29 (2015).

¶10      Conley maintains these four cases were not properly tried jointly under a theory of common scheme or plan. As he notes, the offenses in question "were spread over a period of twelve years," "occurred between 2.5 and 5 years apart," and were otherwise distinguishable. The state has provided no case affirming a trial court's "common scheme or plan" finding that involved criminal acts occurring in such a scattered manner over so many years. *See State v. Miller*, 234 Ariz. 31, ¶¶ 3, 17 (2013) (after separately asking four men to murder five people, defendant committed requested murders himself two months later); *State v. Hausner*, 230 Ariz. 60, ¶¶ 2, 47 (2012) (series of random drive-by shootings in Phoenix area from June 2005 to August 2006); *State v. Hummer*, 184 Ariz. 603, 606, 609 (App. 1995) (sexual behavior with four boys at defendant's home "at various times in 1991 and 1992").

¶11      This case more resembles *State v. Ives*, which involved four counts of child molestation of three separate victims and evidence of similar mistreatment of a fourth. 187 Ariz. 102, 103-04 (1996). There, not unlike here, the trial court found that a number of "unique similarities" justified joinder under Rule 13.3(a)(3), including that: the victims were all girls under the age of ten and known to the defendant beforehand through a

relative or family friend; the events in question involved similar types of touching when a family member was in the vicinity; and all acts but one occurred at the home of the victim. *Ives*, 187 Ariz. at 108 & n.2. Nonetheless, our supreme court rejected the conclusion that joinder under a "common scheme or plan" was appropriate in such a case. "[I]t is clear that the acts committed with these four girls, separated in time by as much as seven years or more, are not acts of 'a particular plan of which the charged crime is a part.'" *Id.* at 108-09 (quoting *State v. Ramirez Enriquez*, 153 Ariz. 431, 433 (App. 1987)). In so concluding, it reasoned that proof of a qualifying "common scheme or plan" requires more than proof of a "visual connection" between the crimes.[2] *Id.* at 106-08. Otherwise Rule 13.3(a)(1) ("same or similar character") and Rule 13.3(a)(3) ("common scheme or plan") are blended "beyond recognition," and the latter "becomes a detour around [a] defendant's right to sever offenses joined because they are similar." *Ives*, 187 Ariz. at 107-08; *see also* Ariz. R. Crim. P. 13.4(b) (when offenses joined under Rule 13.3(a)(1), defendant entitled to severance as a matter of right). Thus, according to our supreme court, "the component acts of a 'common scheme or plan' must be sufficiently related to be considered a single criminal offense." *Ives*, 187 Ariz. at 108. The four incidents involved in this case do not meet that threshold. The trial court therefore erred in denying Conley's motions to sever.

¶12        The trial court also found that "all of the evidence in the cases" would be cross-admissible under Rule 404(b)(2), Ariz. R. Evid., "to demonstrate identity, knowledge, and motive." In its answering brief on appeal, the state re-urged this alternative basis for admission. However, at oral argument, the state conceded that it was unable to formulate a persuasive argument in support of the trial court's finding of cross-admissibility under Rule 404(b). To the extent the arguments regarding identity, knowledge, or motive are more than masquerades for a theory of relevance based on the criminal character of the accused,[3] the

---

[2]When refusing to sever the counts on Rule 13.3(a)(3) grounds, the trial court here repeatedly referenced the now-disapproved "visual connection" standard. *See Ives*, 187 Ariz. at 106-08.

[3] While evidence of general criminal propensity is inadmissible under Rule 404(b), Ariz. R. Evid. 404(c) allows for the admission of evidence of an "aberrant sexual propensity." The state did not pursue admission of the prior act evidence under that theory. Doing so would have required the state to persuade the trial court to make numerous threshold findings as a condition of its admission. *See* Ariz. R. Evid. 404(c)(1). On appeal, the state

probative value of evidence of the other assaults would be substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. *See* Ariz. R. Evid. 403.

**Harmless Error**

**¶13** The state contends that, even if the trial court erred, Conley cannot make the showing of prejudice required for reversal because the court instructed the jury that the state was required to "prove each element of each charge beyond a reasonable doubt" and that the jury was required to "decide each count separately on the evidence with the law applicable to it uninfluenced by [the jury's] decision as to other counts." In support, the state cites a number of cases indicating that an appellant challenging a trial court's refusal to sever "cannot" show the requisite "compelling prejudice" when the jury was instructed in such a manner. *See Miller*, 234 Ariz. 31, ¶ 18; *Hausner*, 230 Ariz. 60, ¶ 48; *State v. Johnson*, 212 Ariz. 425, ¶ 13 (2006). However, in each of those cases, our supreme court also ruled that the charges in question had been properly joined in the first place. *See Miller*, 234 Ariz. 31, ¶¶ 17-18; *Hausner*, 230 Ariz. 60, ¶¶ 44-47; *Johnson*, 212 Ariz. 425, ¶¶ 10-12. And, when it has concluded that a trial court erred in refusing to sever certain charges, our supreme court has found itself "not persuaded" that a jury instruction to consider each offense separately will always suffice to eliminate prejudice. *Burns*, 237 Ariz. 1, ¶¶ 34-37. As the court explained in *Burns*, there may be contexts in which such an instruction "asks jurors 'to act with a measure of dispassion and exactitude well beyond mor[t]al capacities.'" *Id.* ¶ 37 (quoting *United States v. Daniels*, 770 F.2d 1111, 1118 (D.C. Cir. 1985)). This case presented precisely such a context.

**¶14** Nevertheless, despite the trial court's error and the inadequacy of the jury instructions to cure the obvious prejudice, we nonetheless conclude that any error was harmless as to each incident based on the trial record before us. *See id.* ¶ 38 (failure to sever harmless where error "did not affect the jury's verdicts"); *see also State v. Bible*, 175 Ariz. 549, 588 (1993) ("We must be confident beyond a reasonable doubt that the error had no influence on the jury's judgment."). The harmless error inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually

---

has not argued that we should affirm the admissibility of the other acts on that basis.

rendered in *this* trial was surely unattributable to the error." *Bible*, 175 Ariz. at 588 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)).

¶15            As an initial matter, each of the four victims testified at trial. The defense did not meaningfully challenge the credibility of any one of them during cross-examination. Instead, when cross-examining the victims and otherwise throughout trial, the defense's primary focus was the incompetence of law enforcement's investigation of these four cases, with emphasis on the insensitive treatment suffered by the four victims. Of course, neither inadequate investigations nor a systemic lack of sensitivity for sexual assault victims would exonerate Conley. In sum, Conley had no theory of the case that meaningfully challenged the most powerful evidence presented by the state: the victims' unambiguous testimony that they were raped by him.

¶16            As to both J.G. and K.C., sperm with DNA matching Conley's was found inside their vaginas when they submitted to sexual assault examinations and reported having been raped. *Cf. United States v. Wright*, 215 F.3d 1020, 1028 (9th Cir. 2000) (defendant's DNA at crime scene may, depending on circumstances, "alone overwhelmingly" establish defendant's identity as perpetrator). Each also provided a description of her assailant that matched Conley. In addition, J.G. testified about a distinctive vanity license plate on her assailant's car, and Conley confirmed to police that he had owned exactly such a vanity plate. This evidence—together with their unchallenged testimony at trial—was overwhelming as to the charges involving J.G. and those involving K.C.

¶17            Although the state did not possess DNA evidence to support its allegations regarding the crimes involving C.B. and W.L., the evidence presented was substantial and unrebutted. Like J.G. and K.C., C.B. provided a description of her assailant that matched Conley. She also definitively identified Conley from a photo lineup. When police approached him, Conley admitted to having engaged in sexual intercourse with C.B. on the night in question but maintained that the intercourse had been consensual.

¶18            However, C.B. submitted to a sexual assault examination shortly after the incident. That examination revealed both vaginal pain and a "significant" cervical abrasion. The state presented expert testimony that those injuries were inconsistent with consensual sex. Although the jury was aware of Conley's original claim that the acts were consensual, defense counsel did not present consent as a defense. As noted above, when C.B. testified that Conley had sexually assaulted her, defense counsel did not

challenge her claim that she had been the victim of a forcible rape. Indeed, it did not challenge her credibility at all. Nor did the defense present or marshal any evidence of other kinds to corroborate Conley's claim of consent. Given that Conley declined to suggest consent in his opening statement or argue consent in closing, the jury could have reasonably concluded that Conley was not asserting that defense. In the absence of any factual challenge of any kind to C.B.'s testimony that she was raped, coupled with Conley's admission of sexual intercourse with her and the physical evidence that corroborated the forcible nature of that act, we are satisfied that any failure to sever charges did not affect the jury's verdict. *See Burns*, 237 Ariz. 1, ¶ 38.

¶19 W.L. was a minor at the time of the incident, legally incapable of consent. *See* A.R.S. § 13-1405 (age of consent is eighteen years old). When she spoke to police afterward, she told them "exactly who [her rapist] was by name," as well as the name of the man who had been watching while Conley raped her. When encountered at the crime location, the apartment complex, Conley confirmed that he knew W.L. And when the cold-case detective questioned Conley years later, he again acknowledged that he knew W.L., as well as the other man from the neighborhood she had identified by name. Finally, when asked in court if she could identify the man who had sexually assaulted her, W.L. identified Conley without equivocation. As with the other victims, defense counsel did not attempt to impugn her credibility or otherwise raise any questions regarding the accuracy of her account. Here again, we can conclude beyond a reasonable doubt that the trial court's refusal to sever the charges did not affect the jury's verdicts as to W.L. *See Burns*, 237 Ariz. 1, ¶ 38; *Bible*, 175 Ariz. 549 at 588.

¶20 Our dissenting colleague correctly emphasizes the substantial prejudicial impact of the collective evidence on the jury's deliberations regarding each case. We also agree that the record provided Conley with an ample basis to challenge the state's case based on investigative incompetence and delay. But Conley utterly failed to tether those law enforcement failures to any theory of reasonable doubt. Conley had admitted having sexual intercourse with C.B. His only potential defense was consent by C.B. But Conley abandoned that defense at trial. As to W.L., who had not reached the age of consent, his only conceivable defenses were to claim she had misidentified him or fabricated the claim altogether. Yet, he did not challenge W.L.'s credibility in any respect. We cannot agree therefore that the trial court's error in trying the four cases together affected the verdict in any of the cases.

**Alleged Prosecutorial Error**[4]

**¶21**        Conley also contends he was denied his fundamental right to a fair trial due to conduct by the prosecutor he characterizes as improper. As Conley acknowledges, he did not object below to any of the conduct or argument he now challenges on appeal.  Thus, we review only for fundamental, prejudicial error.  *See State v. Murray*, 250 Ariz. 543, ¶ 14 (2021).  The first step of such review requires Conley to demonstrate the existence of trial error.  *Id.* ¶ 18.  As discussed below, he has not done so.

**Law Enforcement's Failures**

**¶22**        Conley first argues that the state improperly appealed to the jury's sense of injustice or sympathy regarding law enforcement's "shabby" treatment of the four victims, making him "the scapegoat for the system's failure to properly investigate the case and treat the victims with dignity." Characterizing this conduct as "pervasive," Conley attempts to support his claim by pointing to portions of the state's opening statement, its questions of the victims regarding lack of timely follow-up on their cases, testimony the state elicited from law enforcement witnesses regarding apparent investigative failures, and the state's summation.

**¶23**        Conley has presented the challenged portions of the state's arguments and questions of witnesses out of context.  To the extent the prosecution addressed law enforcement failures to adequately investigate these crimes around the time they were committed, it was to explain to the jury why acts committed in 1992, 1995, 1999, and 2004 had not been previously prosecuted.  It explained why evidence the jury might expect to see was unavailable at the time of trial in 2021.  The state, no less than a defendant, is entitled to present its theory of the case, mindful of its weaknesses.  Moreover, a prosecutor has wide latitude in presenting

---

[4] As our supreme court has explained, the term "prosecutorial misconduct" broadly encompasses any conduct that violates a defendant's constitutional rights and "sweeps in prosecutorial conduct ranging from inadvertent error or innocent mistake to intentional misconduct."  *State v. Murray*, 250 Ariz. 543, ¶ 12 (2021) (quoting *In re Martinez*, 248 Ariz. 458, ¶ 45 (2020)).  Because Conley has not expressly alleged intentional misconduct or an ethical violation on the part of the state, we use the term "prosecutorial error," consistent with the court's directive in *Martinez*, 248 Ariz. 458, ¶ 47.

arguments to the jury and is permitted to argue all reasonable inferences from the evidence. *State v. Morris*, 215 Ariz. 324, ¶ 51 (2007).

¶24　　　The statements here were within that permissible range. At no point did the prosecution suggest that the jury should disregard the state's burden of proof or convict Conley based solely on law enforcement's failures to investigate or treat the victims with respect. To the contrary, the prosecutor repeatedly urged the jury to focus on the specific evidence presented regarding each crime, putting aside any negative feelings or emotional responses stemming from how police had conducted the investigations and treated the victims.

¶25　　　Perhaps more importantly, Conley's counsel also focused on law enforcement's failures throughout the trial. Indeed, defense counsel began his opening statement by telling the jury that "the way that these cases were investigated was just simply unacceptable" and "completely different to how things would be done now." He noted in particular that police interviews with the four victims were conducted in "callous circumstances, often by only male officers, very blunt, to the point questions, no follow-up victim services offered to any of these people." He argued that the state was asking the jury to "clean up these messed-up investigations that were really a failure on every level"—that "failed so spectacularly all those years ago"—concluding that "the level of failure in these investigations [was] so strong and so pervasive that [the jury would] have no choice but to find [Conley] not guilty."

¶26　　　This theme continued through defense counsel's questioning of the victims, law enforcement officers, and other witnesses. And it was then the central focus of defense counsel's summation. He began by thanking the jurors for their care and attention to the case, which he said was "certainly much more care and attention than this case has had for decades," given law enforcement's "garbage" investigations. He went on to argue that the cases had been "corrupted from the beginning," due to the "shocking" failure of four law enforcement officers—who he called "four of the worst detectives Tucson's ever had"—"to follow up investigations, to report accurately, to hold onto their recordings, to take photographs, to do the basics of investigation that we would all expect to be done today." He argued that law enforcement had "bungl[ed]" the investigation from "start to finish, head to tail," claiming that the state was asking the jury to "clean up those mistakes" and make Conley "the scapegoat for those mistakes." And he argued that the victims had been essentially "ignored" due to "systemic" problems with law enforcement.

¶27        In short, law enforcement's failures and callous treatment of the victims in this case was the central theme of Conley's defense. "Prosecutorial comments which are a fair rebuttal to areas opened by the defense are proper." *State v. Alvarez*, 145 Ariz. 370, 373 (1985).

¶28        Finally, as noted above, the state repeatedly reminded the jury "to follow the evidence and to follow the law to make decisions based on Charlie Conley's guilt and the evidence of that guilt and not based on any emotion [it had] about the degree to which these women were betrayed by law enforcement." The trial court also began the trial by instructing the jury that it could not "be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." It then reminded the jury on the final day of trial that it "must not be influenced by sympathy" for the victims, and that the state was required to "prove each element of each charge beyond a reasonable doubt." We must presume the jury followed these instructions. *Miller*, 234 Ariz. 31, ¶ 22.

**Presumption of Innocence**

¶29        Conley also focuses on the following statement from the state's summation: "So what you do have, ladies and gentlemen, shows you that Charlie Conley started out with the presumption of innocence. We are no longer there." He contends this comment improperly shifted the burden of proof and denied him a fair trial.

¶30        Again, Conley takes the challenged portion of the state's argument out of context. The prosecutor did not, as Conley alleges, tell the jury "that he was no longer presumed innocent." Fairly interpreted in context, the challenged statement instead implied that, although the presumption of Conley's innocence was the starting point for the jury's consideration of the charges against him, the state had rebutted that presumption by presenting sufficient evidence of each crime. Indeed, immediately after the "[w]e are no longer there" statement, the prosecutor went on to discuss in detail the evidence the state had presented during trial to prove that Conley had committed each offense. And, in rebuttal summation, the state again emphasized the evidence it had presented to prove each crime and argued that it had satisfied its ongoing burden of proving Conley guilty beyond a reasonable doubt. The state was permitted to argue that it had met its burden of proof. *See Bible*, 175 Ariz. at 602 ("Unlike opening statements, during closing arguments counsel may summarize the evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the evidence, and suggest ultimate conclusions.").

¶31        Moreover, even if the prosecutor's statement was improper, any error was remedied.  The trial court instructed the jurors before deliberations:  "Every defendant is presumed to be innocent.  You must start with the presumption that the defendant is innocent."  The court went on to reiterate the state's burden of proving Conley guilty beyond a reasonable doubt by proving "each element of each charge beyond a reasonable doubt."  It then instructed that the jury needed to be "firmly convinced" of Conley's guilt based on the evidence presented to return any guilty verdict, and that, if any juror thought there was "a real possibility that he is not guilty, [he or she] must give [Conley] the benefit of the doubt and find him not guilty."  Again, we must presume the jury heeded these instructions.  *Miller*, 234 Ariz. 31, ¶ 22.[5]

**Disposition**

¶32        For the foregoing reasons, we affirm Conley's convictions and sentences.

C A T T A N I, Judge, concurring in part and dissenting in part:

¶33        I respectfully dissent.  I agree with the majority that the superior court erred by denying Conley's motion to sever the four unrelated sexual assault counts.  I disagree, however, that the error was harmless as to the two counts for which there was no DNA evidence.  In my view, it is difficult to conceive of a case in which a defendant is not unfairly prejudiced by the improper joinder of sexual assault counts, let alone the joinder of counts involving unrefuted DNA evidence establishing guilt on those counts with counts for which there is no biological evidence.  And this is not such a case.  I agree with Conley that the state was improperly permitted to carry out a strategy whereby its weaker cases were tried alongside its stronger cases so the jury would find Conley guilty of all

---

[5]Conley contends that even if the prosecutor's comment about the presumption "is insufficient to find a fair trial was denied it must be considered as part of the cumulative of misconduct which denied [him] a fair trial."  But Conley has not established any instances of misconduct.  Thus, in addition to our conclusions above, we further conclude that when considered cumulatively, the alleged instances of prosecutorial error could not have affected the jury's verdicts.  *See State v. Bocharski*, 218 Ariz. 476, ¶ 75 (2008) ("Absent any finding of misconduct, there can be no cumulative effect of misconduct sufficient to permeate the entire atmosphere of the trial with unfairness.").

the alleged offenses. Accordingly, I would reverse the two convictions for which there was no DNA evidence.

¶34 The superior court concluded that the four rape counts were properly joined under a "common scheme or plan" theory. But the four counts resulted from four separate incidents that occurred over a fourteen-year span in different locations and involved unrelated victims. The only significant commonality was the fact of a sexual offense. The fact that the four victims were young, of slight build, and were sexually assaulted in isolated places does not suggest a unique connection between any of the offenses, particularly given the length of time between the crimes. Accordingly, I agree with the majority that the "component acts" were not "sufficiently related to be considered a single criminal offense," *Ives*, 187 Ariz. at 108, and with the majority's conclusion that evidence of the separate offenses would not have been cross-admissible in separate trials.

¶35 The Arizona Supreme Court has held that, in assessing whether an objected-to error is harmless, we must determine whether the state has shown "beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence." *State v. Escalante*, 245 Ariz. 135, ¶ 30 (2018) (quoting *State v. Escalante-Orozco*, 241 Ariz. 254, ¶ 126 (2017)). "The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Bible*, 175 Ariz. at 588 (quoting *Sullivan*, 508 U.S. at 279).

¶36 Applying that standard, I agree with the majority that error relating to joining the counts involving victims J.G. and K.C. was harmless. Undisputed DNA evidence established that in both of those cases, seminal fluid inside the victim's vagina came from Conley, and Conley did not assert that he had engaged in consensual sex with the victims. Under these circumstances, I agree that joinder of those two counts was harmless beyond a reasonable doubt.

¶37 I disagree, however, that the error was harmless for the counts involving victims C.B. and W.L. Without DNA evidence, the cases rested primarily on witness credibility. And in my view, when the jurors considered testimony from victims C.B. and W.L., evidence of prior unrelated sexual assaults unfairly tipped the scale in the state's favor by implying that the jurors could conclude Conley committed rapes (for which there was no biological evidence) because he committed the same crime against other victims.

¶38        Trying the four sexual assault cases together over defense counsel's objection was not an inadvertent "technical" error that had no bearing on how the cases were tried. The state presented testimony explaining that the four alleged crimes resulted in "cold" cases that were not pursued until 2018, when DNA testing linked Conley to the 1992 and 1995 sexual assaults. A witness for the state testified that, because Conley had been identified as a suspect in the 1999 and 2004 cases, the state then decided to pursue charges in those cases. There was no DNA link to the 1999 and 2004 cases, and the only "new" evidence beyond what had previously been deemed insufficient to pursue charges against Conley was the DNA evidence linking Conley to the 1992 and 1995 sexual assaults. Accordingly, from my perspective, there should be no question that the DNA evidence from the 1992 and 1995 assaults "contribute[d] to or affect[ed]" the verdicts relating to the 1999 and 2004 assaults.

¶39        The state not only relied on the DNA evidence in explaining the delay in prosecuting the cases, but also as substantive evidence of guilt as to the 1999 and 2004 assaults. The prosecutor began closing argument by highlighting the significance of the DNA evidence relating to the 1992 assault, noting that the major male profile from the sperm fraction inside J.G.'s vagina "matched Charlie Conley to a rate of one in 5.3 octillion. Zeros and zeros and zeros beyond the total population of living humans on the earth . . . ." The prosecutor then referred to the DNA evidence linking Conley to the 1995 assault, with the major male profile from sperm inside K.C.'s vagina "match[ing] Charlie Conley at a frequency of one in 1.9 sextillion."

¶40        Turning to the 1999 assault, in which C.B. was assaulted after leaving her job at a bar, the prosecutor noted that Conley had taken C.B. into an abandoned apartment, "just like he took [J.G.] into an abandoned apartment [in 1992], just like he took [K.C.] into an abandoned space [in 1995], and he tells her what she is going to do." The prosecutor then argued that, although Conley told police officers his encounter with C.B. was consensual, and although C.B. acknowledged that she "cooperated" with Conley, she did so only because of his size, and that after the alleged assault, C.B. had cervical abrasions inconsistent with consensual intercourse.

¶41        As to the 2004 assault, the prosecutor noted that victim W.L., who knew Conley and who Conley admitted knowing, did not report being raped for several days after the assault. The prosecutor then argued:

> [Y]ou know that [Conley] sexually assaulted
> [W.L.] because she told you so. . . . And you

know that it was Charlie Conley because she pointed him out here, and you also know that it's Charlie Conley because there is a pattern. You absolutely cannot find Charlie Conley guilty of one crime just because you believe that he's guilty of other crimes. *But you can consider if there is a pattern here that demonstrates that Charlie Conley is choosing particular girls under particular circumstances to commit a particular crime in a particular circumstance.*

(Emphasis added.)

¶42　　　This is precisely the type of propensity evidence that is inadmissible under Rule 404(b) of the Arizona Rules of Evidence, which prohibits the introduction of evidence of other crimes, wrongs, or acts "to prove the character of a person in order to show action in conformity therewith." Although there are exceptions to Rule 404(b) for evidence that shows, for example, motive, plan, intent, or identity, I agree with the majority that here, the evidence of other sexual assaults was not so unique as to fit within any of those exceptions. And under Rule 13.4(b) of the Arizona Rules of Criminal Procedure, a defendant is entitled to severance of offenses joined because they are the same or of similar character unless evidence of the other offenses would be admissible if the offenses were tried separately. Thus, I agree with the majority that joining the four cases resulted in presentation of inadmissible character evidence.

¶43　　　In my view, the improperly presented evidence unfairly prejudiced Conley's defense, and I thus disagree with the majority's opinion that the error in admitting the evidence was harmless. The Arizona Supreme Court has opined that "profile evidence" may not be used as substantive proof of guilt because of the "risk that a defendant will be convicted not for what he did but for what others are doing." *State v. Ketchner*, 236 Ariz. 262, ¶ 15 (2014) (quoting *State v. Cifuentes*, 171 Ariz. 257, 257 (App. 1991)). That rationale applies with even greater force to evidence of other crimes, wrongs, or acts committed by the same defendant. Presenting criminal conduct evidence that does not qualify for admission under an exception to Rule 404(b) creates a substantial risk that a defendant will be convicted based on "profile" or "propensity" evidence and not on the facts underlying the charged offense.

¶44　　　The majority nevertheless concludes that the error in joining the cases was harmless because the evidence involving victims C.B. and

W.L. was "substantial" and "unrebutted." I agree that the evidence was sufficient to support a conviction for the counts relating to victims C.B. and W.L. But that is a different inquiry than whether an error in improperly admitting prejudicial evidence was harmless beyond a reasonable doubt. And in this case, it is anomalous to conclude that the improperly admitted evidence did not affect the verdicts relating to C.B. and W.L. when the prosecutor urged the jurors to consider the evidence as substantive proof of guilt.

¶45 Finally, I disagree with the majority's view that Conley's failure to meaningfully challenge the victim's testimony strongly supports the conclusion that error in joining the cases was harmless. Defense counsel's trial strategy was constrained by the circumstances presented, and we are left to speculate regarding whether counsel may have pursued a different strategy absent essentially indisputable proof that Conley had sexually assaulted two other victims. Furthermore, it is impossible to assess whether the strategy Conley's counsel chose to pursue—highlighting law enforcement's lack of diligence in prosecuting the case—would have been more effective absent proof of the prior sexual assaults. In my view, it is at least plausible that jurors would have given some degree of weight to the fact that law enforcement had the evidence presented at trial (in the non-DNA cases) years before deciding to pursue charges against Conley. Some jurors may reasonably have questioned why the cases were not deemed strong enough to bring charges for years after the reported sexual assaults. Thus, strong evidence of guilt notwithstanding, there is at least a chance jurors would have determined that the state did not prove guilt beyond a reasonable doubt in the cases involving victims C.B. and W.L.

¶46 In sum, in my view, improperly admitted propensity evidence (particularly DNA evidence establishing that a defendant is a known rapist) is unfairly prejudicial as it relates to unrelated rape charges. And in this case, given the state's reliance on the improperly admitted evidence of the 1992 and 1995 sexual assaults to establish guilt as to the other sexual assaults, the error in trying the cases together was not harmless beyond a reasonable doubt. I would reverse Conley's convictions and sentences on the counts relating to the 1999 and 2004 sexual assaults.