NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JUSTIN KIETH PETERSON, *Appellant*.

No. 1 CA-CR 24-0024

FILED 04-29-2025

Appeal from the Superior Court in Maricopa County
No. CR2021-137345-001
The Honorable Justin Beresky, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Celeste Kinney
*Counsel for Appellee*

Bain & Lauritano, PLC, Glendale
By Amy E. Bain
*Counsel for Appellant*

**MEMORANDUM DECISION**

Judge D. Steven Williams delivered the Court's decision, in which Presiding Judge Jennifer M. Perkins and Judge James B. Morse Jr. joined.

---

**W I L L I A M S**, Judge:

¶1 Defendant Justin Kieth Peterson appeals his convictions and sentences for second-degree murder. For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2 At a quarter to midnight on a fall evening in 2021, Will[1] arrived at the home of his friend, Whitney. As he parked and stepped out of his vehicle, Will observed Peterson, a man he did not know, across the street, yelling and swearing. Feeling verbally accosted, Will went inside the house and told Whitney, her roommate, Veronica, and Veronica's boyfriend, Vince, about Peterson's tirade.

¶3 Initially, Whitney ventured outside alone to face Peterson, but once she determined he was yelling for Veronica, she quickly returned to the house and waited for Vince to "confront the situation." Despite Whitney urging him to fight, Vince did not hit or push Peterson but ordered him to leave. As Peterson began walking away, Veronica emerged from the house, crossed the street, and had a terse exchange with Peterson. Veronica and Vince then trailed behind as Peterson walked away.

¶4 When he reached his home—a few houses down—Peterson retrieved an "AK-47 style" semiautomatic firearm from his bedroom. Moments later, he went outside, headed back toward Veronica and Vince, and discovered his wife, Pam, engaged in a physical struggle with Veronica. Peterson fired 33 rounds, repeatedly striking Veronica and Vince, killing them both.

¶5 Leaving the bodies in the street, Peterson and Pam walked home, where she called 9-1-1. While speaking with a 9-1-1 operator, Pam, though quite distraught, recounted that her neighbors had hit her and "pulled a revolver" on both her and Peterson. When the operator asked for the location of the unidentified neighbors, Pam responded that they were outside and then, while looking out to the street, reported that she saw

---

[1] We use pseudonyms to protect the victim's and witnesses' identities.

other unnamed neighbors taking the revolver that had been used to threaten her.

¶6          When police officers arrived at the scene, they placed Peterson under arrest. After taking Peterson into custody, officers canvassed the neighborhood and obtained surveillance videos recorded at neighboring homes.

¶7          Meanwhile, Peterson told the officers transporting him to a police station that Veronica and Vince had pointed a revolver at both him and Pam. Other officers interviewed Will and Whitney. During his initial conversations with police officers, Will did not disclose any information about the revolver. But when he overheard officers questioning Whitney about a missing gun, Will volunteered that he had taken the revolver from the scene—where it had been laying near the bodies—and placed it under Whitney's mattress. Once officers secured a search warrant, they recovered the revolver from Whitney's bedroom and later determined that it belonged to Veronica's father.

¶8          The State charged Peterson with two counts of second-degree murder. The State also alleged several aggravating factors.

¶9          After a twenty-two-day trial, a jury convicted Peterson as charged. The jurors also found four aggravating factors—physical, emotional or financial harm to the victims or their immediate family, multiple victims in a single incident, the opportunity to walk away from a confrontation, and the need to protect future victims from Peterson—as to each count.

¶10          At sentencing, the trial court imposed presumptive, concurrent terms of sixteen years' imprisonment for each count. Peterson timely appealed, and we have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

### I.    Sufficiency of the Evidence

¶11          Peterson challenges the trial court's rulings denying his motion for judgment of acquittal following the State's presentation of its case-in-chief and his renewed motion for judgment of acquittal after the jury rendered its verdicts. He contends the State failed to disprove his justification defenses.

**¶12** We review *de novo* a trial court's ruling on a motion pursuant to Arizona Rule of Criminal Procedure ("Rule") 20, whether at trial or post-verdict. *State v. West*, 226 Ariz. 559, 562–63, ¶¶ 15, 19 (2011). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 562, ¶ 16 (internal quotation marks omitted). In reviewing the sufficiency of the evidence, we test the evidence "against the statutorily required elements of the offense," *State v. Pena*, 209 Ariz. 503, 505, ¶ 8 (App. 2005), and neither reweigh conflicting evidence nor assess the credibility of witnesses, *see State v. Buccheri-Bianca*, 233 Ariz. 324, 334, ¶ 38 (App. 2013). Sufficient evidence upon which a reasonable jury can convict may be direct or circumstantial, *West*, 226 Ariz. at 562, ¶ 16, and a judgment of acquittal is appropriate only when "there is no substantial evidence to support a conviction," Ariz. R. Crim. P. 20(a)(1), (b)(1).

**¶13** As charged in this case, a person commits second-degree murder by, without premeditation: (1) intentionally causing another person's death; (2) engaging in conduct while knowing that the conduct will cause death or serious physical injury, and causing the death of another person; or (3) recklessly engaging in conduct that creates a grave risk of death and thereby causing the death of another person. A.R.S. § 13-1104(A)(1)–(3).

**¶14** At trial, Peterson did not contest that he repeatedly shot and killed Veronica and Vince, knowing that his conduct would cause them serious physical injury or death. Instead, he asserted justification defenses, contending he had to use lethal force to protect himself and Pam from serious bodily harm or death.

**¶15** The State presented evidence of Pam's interview with detectives shortly after Peterson's arrest. In response to questioning, Pam stated that she met Veronica six weeks before the shooting, when Veronica saw her injured on a greenbelt in their neighborhood and offered help. After their initial meeting, Pam tried to befriend Veronica and visited with her "a few times." According to Pam, during these occasions, Veronica removed her clothing without her consent and coerced her to use drugs. After Pam recounted these interactions to Peterson, characterizing them as "assault," he stationed himself across the street from Veronica's home (both on the evening of the shooting and a prior evening) so he could "talk" to her and ask her to "leave [Pam] alone." On the evening of the shooting, in an attempt to persuade him to come home, Pam walked down to Peterson's location, spoke with him briefly, and then returned home, alone, to check

on their children. Moments later, Pam heard shouting and went outside "to see what was going on." As she walked out, Peterson ran past her into their house. Although he said nothing, Pam "could tell something was not right." She then saw Veronica and Vince walking up the sidewalk toward her home and went out to meet them. Pam explained that when they met in front of another neighbor's house, Veronica "pulled a revolver out." Instinctively, Pam grabbed the revolver and wrestled it away from Veronica, but Vince then wrangled the revolver from her. While Vince pointed the revolver at Pam and Veronica hit her, Peterson approached and opened fire. During their walk back home, Peterson told Pam that Veronica had threatened him with a gun near her house and begun following him home, leading him to arm himself.

¶16        During her trial testimony, Pam restated much of the information she initially told detectives concerning her interactions with Veronica. Her trial account of the evening of the shooting, however, departed from her interview statements in some material respects: (1) she was in her backyard, not in front of her house, when Peterson returned home, (2) she barely caught a glimpse of him before he turned down a hallway, but she "could tell something was wrong" based on the speed with which he entered the house and his frantic "energy," (3) she noticed that he had not shut the front door, which prompted her to go outside and walk out to meet Veronica and Vince, (4) when Veronica pulled out a revolver and pointed it at her chest, she grabbed the barrel of the gun and then all three of them began wrestling for it, (5) she "blacked out," and when she regained consciousness, she was kneeling on the ground with Veronica and Vince standing to her right and left and one of them holding the revolver to her head, and (6) someone fired the revolver, causing her to temporarily lose her hearing and become disoriented, only seeing flashes of light before Peterson approached her and they walked home.

¶17        To explain the inconsistencies in her statements, Pam testified she had been in shock during her police interview. She also asserted the interviewing detectives had misunderstood her and put "words in [her] mouth."

¶18        When asked about his interview with Pam, the lead detective testified she never reported "blacking out" or being held on her knees at gunpoint. He also stated Pam never claimed that someone fired the revolver, causing her to become temporarily deaf. Despite these discrepancies, the detective stated he always believed Pam had been threatened with a revolver. The detective also testified that other 9-1-1

callers had reported that Pam and Peterson "had been threatened," but he did not identify the nature of those reported threats.

¶19        Several neighbors also testified. One neighbor recounted that around 11:45 p.m., he looked outside his window to investigate some noises and saw two women standing on the sidewalk in front of his property, facing each other. He recognized Pam as one of the women but did not recognize the other woman. Soon, an unfamiliar man joined them, and the women began a physical altercation. Moments later, the neighbor observed Peterson, whom he identified by both appearance and voice, running toward the others while yelling, "you can't do that to my wife." After the yell, the neighbor heard a flurry of shots fired and saw Peterson holding a weapon. As Peterson fired, Pam backed away from the sidewalk, onto nearby rocks. When Peterson stopped shooting, the neighbor heard Pam say, "you didn't have to kill them." Another neighbor testified that while he was watching television on the night of the shooting, he heard "people fighting" outside. As the sounds became louder, he opened his front door and heard two women and one man yelling. He then heard an unidentified male voice say, "this is what I was waiting for," immediately followed by gunfire.

¶20        Before the State rested, each side called an audio forensics expert to analyze the audio file from a surveillance camera recording. The defense expert opined that the first gunshot had a distinctly lower frequency than the rest of the shots, demonstrating that two guns were discharged. By contrast, the State's sound expert concluded that the "shots could all be from a single gun that was moving or being pointed in different directions," but he could not "rule out the possibility that there w[as] more than one gun involved."

¶21        After the State presented its case-in-chief, Peterson moved for judgment of acquittal. The trial court denied his Rule 20 motion, noting that despite the "conflicting evidence about who may have had the gun at the time [] Peterson fired shots," either Veronica or Vince, alone, held the revolver when Peterson shot them, yet he targeted them both.

¶22        Following the trial court's ruling, defense counsel called the lead detective back to the stand. While reviewing surveillance footage capturing Veronica's approach of and interaction with Peterson outside her home, the detective acknowledged that a shadow near Veronica's hand could be, among other things, a revolver, but he explained that the quality of the imaging prevented any clear determination. He conceded, however, that the surveillance footage demonstrated that Veronica never returned

home, so she necessarily had the revolver in her possession when she approached Peterson.

¶23 Lastly, Peterson testified in his own defense. He stated that on the evening of the shooting, he "was minding [his] own business" when Vince approached him and said, "[y]ou can't be over here," to which he responded, "[t]hat's fine. I'll leave." He admitted that as he began walking away, he shouted, "[t]hanks for molesting my wife, [expletive expletive]" to Veronica. At that point, Veronica pulled out a gun and pointed it at his chest, prompting him to turn and run home. Although he intended to lock his front door, secure his family, call the police, and then arm himself, Peterson admitted that he instead "flung" open his front door, "ran down the hallway," and retrieved a loaded gun from his bedroom closet. Once armed, he quickly looked for Pam but could not find her and then heard female voices outside the front of his house. When he followed the voices outside, he saw Veronica hitting Pam in the face with her left hand while holding a gun pointed at Pam with her right hand. Peterson testified that he could not recall whether Pam was on her knees and stated that he never heard a gunshot from the revolver before shooting Veronica. According to Peterson, after he repeatedly shot Veronica, Vince "got ahold of the gun" and pointed it directly at him, so he shot Vince as well. Although Peterson recounted that the revolver switched hands, he expressly denied that Veronica had ever dropped the weapon. In response to jurors' questions, Peterson testified that: (1) Pam evaded the spray of bullets because "[s]he was back several feet" and he "was [] very cautious not to shoot [his] wife," and (2) he took the safety off his weapon in the hallway, before he heard any screaming outside.

¶24 "Justification is not an affirmative defense that the defendant must prove." *State v. King*, 225 Ariz. 87, 89, ¶ 6 (2010). Rather, because "actions taken in self-defense [or the defense of a third person] transform conduct that would otherwise be criminal into legally permissible conduct," *State v. Carson*, 243 Ariz. 463, 466, ¶ 11 (2018), when a defendant presents any evidence of self-defense or the defense of a third person, the State must prove "beyond a reasonable doubt that the defendant did not act with justification," *King*, 225 Ariz. at 89, ¶ 6 (quoting A.R.S. § 13-205(A)).

¶25 To meet its evidentiary burden and disprove Peterson's justification defenses, the State had to establish that no reasonable person would have believed that the use of deadly physical force was immediately necessary to protect Peterson and/or Pam from Veronica's and Vince's threatened use of deadly physical force. *See* A.R.S. § 13-404(A) ("[A] person is justified in threatening or using physical force against another when and

7

to the extent a reasonable person would believe that physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful physical force."); A.R.S. § 13-405(A) ("A person is justified in threatening or using deadly physical force against another: 1. If such person would be justified in threatening or using physical force against the other under § 13-404, and 2. When and to the degree a reasonable person would believe that deadly physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly physical force."); A.R.S. § 13-406 ("A person is justified in threatening or using physical force or deadly physical force against another to protect a third person if, under the circumstances as a reasonable person would believe them to be, such a person would be justified under § 13-404 or 13-405 in threatening or using physical force or deadly physical force to protect himself against the unlawful physical force or deadly physical force a reasonable person would believe is threatening the third person he seeks to protect.").

¶26 Although the surveillance videos captured a terse exchange between Veronica and Peterson in front of Veronica's home, they neither confirmed nor disproved that Veronica or Vince threatened either Pam or Peterson with a revolver. Likewise, no neighbors testified that they saw Veronica or Vince display a weapon. In fact, Pam and Peterson provided the only evidence that such threats occurred, and their accounts were not only inconsistent with each other, but Pam's trial testimony contravened her prior statements to detectives.

¶27 Given these inconsistencies and discrepancies, reasonable jurors could have found Pam's interview statements—made immediately following the underlying events—more credible. Indeed, reasonable jurors could have found several aspects of Pam's and Peterson's trial accounts simply implausible, including testimony that: (1) Veronica and Vince stood beside Pam—with one of them holding a gun to her head—when Peterson sprayed them with bullets, yet Pam suffered no bullet injuries; (2) Veronica simultaneously pointed a gun at Pam with her left hand while slapping Pam with her right hand, yet Pam stood "several feet" away from her and out of the line of fire when Peterson shot her; and (3) during the nine seconds of gunfire, Vince managed to gain control of the revolver that Veronica had been pointing at Pam when the shooting began—though Veronica did not drop it—and promptly pointed it at Peterson. Reasonable jurors also could have dismissed Peterson's trial testimony that he returned to his house with the intent to secure his family and home, contact the police, and then arm himself in the event Veronica and Vince reached his home before police arrived. Both Pam's interview statement—that Peterson

8

ran past her into the house without warning her of any impending danger—and Peterson's trial admissions—that he did not shut and lock his front door, check on his children, or call the police—belied this claimed intent. In fact, consistent with the aggravation verdict finding that Peterson could have "walk[ed] away from a confrontation," reasonable jurors could have concluded that Peterson returned to his home with the intent to arm himself with a powerful weapon and then return to the street to confront Veronica and Vince.

**¶28** In sum, viewed in its entirety, substantial evidence existed from which a reasonable jury could find that Peterson, at a minimum, recklessly engaged in conduct that created a grave risk of death, thereby killing Veronica and Vince, and that he did so without justification. Therefore, the trial court did not err by denying Peterson's motion for judgment of acquittal and renewed motion for judgment of acquittal.

## II. Adequacy of the Jury Instructions

### A. "Lesser-Included Offense"

**¶29** Peterson argues the trial court erred by failing to instruct *sua sponte* the jury on what he characterizes as the "lesser included offense" of provocation manslaughter. He contends "overwhelming evidence" established that he shot Veronica and Vince "upon a sudden quarrel or heat of passion resulting from adequate provocation."

**¶30** Because Peterson failed to object to the instructions given and did not request a provocation-manslaughter instruction, we review his appellate challenge only for fundamental, prejudicial error. *State v. Escalante*, 245 Ariz. 135, 140, ¶ 12 (2018); *see also* Ariz. R. Crim. P. 21.3(b) ("Any objection to the court's giving or failing to give any instruction . . . must be made before the jury retires to consider its verdict. . . . If a party does not make a proper objection, appellate review may be limited."); *State v. Gallegos*, 178 Ariz. 1, 12 (1994) ("[A] trial judge's failure to give an instruction *sua sponte* provides grounds for reversal only if such failure is fundamental error.").

**¶31** "A lesser-included offense is one 'composed solely of some but not all of the elements of the greater crime so that it is impossible to have committed the crime charged without having committed the lesser one.'" *State v. Lua*, 237 Ariz. 301, 303, ¶ 7 (2015) (quoting *State v. Celaya*, 135 Ariz. 248, 251 (1983)). Applying the "elements test," provocation manslaughter encompasses all the elements of second-degree murder but adds the "mitigating 'circumstance' of adequate provocation." *Id.* Thus,

"provocation manslaughter is not a lesser-included offense of second-degree murder" but "a lesser degree of homicide." *Id.* (citing A.R.S. §§ 13-1101(2), -1103(C), -1104(C)).

¶32 Our supreme court has long "approved provocation-manslaughter instructions in first- and second-degree murder trials when supported by the evidence." *Id.* at 305, ¶ 14. In some of these cases, the supreme court issued broad pronouncements that manslaughter instructions "are required when supported by the evidence," *State v. Delahanty*, 226 Ariz. 502, 507, ¶ 23 (2011), and "[a]n accused murderer is entitled to an instruction on . . . manslaughter if the evidence shows the killing was done in the heat of passion," *State v. Noleen*, 142 Ariz. 101, 107 (1984), but Peterson has not cited, and our research has not revealed, any case finding a superior court committed fundamental, prejudicial error by failing to instruct *sua sponte* a jury on provocation manslaughter.

¶33 Moreover, borrowing the analytic framework applied to lesser-included offenses, in non-capital cases, the trial court is not required to instruct *sua sponte* on every lesser offense supported by the record. *State v. Gipson*, 229 Ariz. 484, 486, ¶ 13 (2012). Instead, the court has a duty to provide such an instruction only when its omission "would fundamentally violate [the] defendant's right to a fair trial" and interfere with the "defendant's ability to conduct his defense." *State v. Vince*, 146 Ariz. 597, 604 (1985), *overruled in part on other grounds by State v. Ives*, 187 Ariz. 102, 106–08 (1996). Indeed, trial judges should "exercise restraint in instructing *sua sponte*" on lesser offenses, and, in general, "should withhold charging on" lesser offenses "unless one of the parties requests it" because the issue is "best resolved . . . by permitting counsel to decide on tactics." *Gipson*, 229 Ariz. at 487, ¶¶ 15–16 (internal quotation marks omitted); *see also State v. Vanderlinden*, 111 Ariz. 378, 379–80 (1975) (explaining that when a defendant assesses the evidence presented by the State and concludes it is insufficient "to secure a conviction of the greater crime," the decision to forego jury instructions on lesser-included offenses may not constitute strategic error but a viable strategy to "secure a complete acquittal"); *State v. Krone*, 182 Ariz. 319, 323 (1995) (explaining "there may well be cases in which the defendant will be confident enough that the State has not [proven the greater offense] that he will want to [forego lesser-included offense instructions and] take his chances with the jury") (internal quotation marks omitted).

¶34 In this case, Peterson predicated his entire defense on justification. During the settling of the final jury instructions, defense counsel requested self-defense and defense of third-party instructions. The

trial court stated it would provide the defense of third-party instruction and then asked whether counsel would present an "all or nothing" defense or "ask[] for a lesser." In response, defense counsel declined any lesser offense instruction and reiterated his request for a self-defense instruction. Later, the court again inquired whether defense counsel requested a lesser offense instruction, and defense counsel again declined any additional instructions.

**¶35**      Given Peterson's defense strategy, the trial court's failure to instruct *sua sponte* the jury on provocation manslaughter did not interfere with his right to present his defense. *See Krone*, 182 Ariz. at 323 ("A defendant should not have a lesser included instruction forced upon him."). Simply put, a provocation-manslaughter instruction was wholly inconsistent with the defense theory of the case. Therefore, the trial court did not err by failing to instruct *sua sponte* the jury on provocation manslaughter.

## B. Alternative Justification Instruction

**¶36**      Peterson argues the trial court erred by failing to instruct *sua sponte* the jury on the use of force in crime prevention. Although the court instructed the jury on self-defense and the defense of a third party, he contends he was prejudiced by the omission of a use of force in crime prevention instruction because the jurors were not told that he had no duty to retreat and was presumed to have acted reasonably. *See* A.R.S. § 13-411(A)–(C).

**¶37**      Because Peterson failed to object to the instructions given and did not request a use of force in crime prevention instruction, we review his appellate challenge only for fundamental, prejudicial error. *Escalante*, 245 Ariz. at 140, ¶ 12. "[T]rial courts have no sua sponte duty to instruct the jury on justification defenses that have not been requested." *State v. Brown*, ___ Ariz. ___, ___, ¶ 25, 556 P.3d 776, 782 (App. 2024). Therefore, Peterson "has failed to show error by the [trial] court failing, sua sponte, to instruct the jury" on the use of force in crime prevention. *Id.* at ¶ 30.

## CONCLUSION

¶38        We affirm the convictions and sentences.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:         JR